Ida L. POTTER, Plaintiff-Appellant,

v.

Harrison L. WINTER, Executor of the Estate of M. E. Turner, Deceased; The Guaranty Trust Company of Missouri, a corporation alleged Trustee under a purported Revocable Indenture of Trust of Charles Edward Potter; Rita Potter Trigg: Rita Potter Trigg, alleged Trustee under purported Revocable Indenture of Trust of Charles Edward Potter; Margaret B. McCane; Warren Todd McCane, Jr., a minor; Lidamay Nuderscher; Patricia Ann Nuderscher, a minor; Peggy Lou Trigg, a minor; Joseph Edward Trigg, a minor; Pamela Potter Trigg, a minor; Imperial Council of the Ancient Arabic Order of the Nobles of the Mystic Shrine of North America, a corporation; Shriners Hospital for Crippled Children, of St. Louis, Missouri; John E. Taylor, Attorney-General of the State of Missouri, Defendants-Respondents.

No. 44514.

Supreme Court of Missouri.

Division No. 1.

June 13, 1955.

Cox, Cox & Cox, Harvey B. Cox, William A. Moffitt, Jr., St. Louis, for plaintiff-appellant.

Selden Blumenfeld, Blumenfeld & Abrams, St. Louis, for defendant-respondent Rita Potter Trigg, individually and as co-trustee, and for Trigg minors.

Orville Richardson, Hullverson & Richardson, St. Louis, for defendants-respondents Harrison L. Winter, executor of the estate of M. E. Turner, deceased, and the Guaranty Trust Co. of Missouri, individually and as co-trustee.

VAN OSDOL, Commissioner.

■ This is an appeal from a judgment for defendants and an order dismissing plaintiff's petition in her action in equity to set aside a revocable inter vivos trust created by plaintiff's husband, Charles Edward Potter, now deceased. The resolving of the contentions of the parties, plaintiff and defendants, will affect the ultimate devolution to contingent beneficial property interests of value in excess of $7,500. This court has appellate jurisdiction of the case on the ground of the "amount in dispute". Const. Art. V, § 3, V.A.M.S.

It is contended by plaintiff-appellant, widow of Charles Edward Potter, settlor, that the trust instrument executed by him is invalid, null and void. It is contended there was no valid delivery of any of the assets or corpus of the alleged trust during the lifetime of the settlor with the intention of relinquishing his sole ownership; the instrument of trust contained provisions which violate the rule against perpetuities; the instrument was testamentary in character and was not executed in accordance with the Statute of Wills; and the instrument was in legal fraud of plaintiff's rights as the wife and widow.

Charles Edward Potter died October 11, 1948. At the time of his death he was seventy-nine years of age and in ill health. He had been the founder of the Potter Electric Signal & Manufacturing Company, a corporation, and for many years and until his death was president of the Company.

For some time prior to July 9, 1948, Mr. Potter had owned and held, either in his own name or through nominees, all of the common stock and substantially all of the preferred stock of the Company.

Plaintiff, Ida L. Potter, and Mr. Potter were married September 19, 1944, and lived together as man and wife until Mr. Potter's death. No children were born to the marriage.

Mr. Potter had been formerly married to Adda Lee Potter, who died August 12, 1944. To this former marriage there was one child born—Rita Potter, who married Dr. Joseph F. Trigg. Three children, now minors—Peggy Lou Trigg, Joseph Edward Trigg, and Pamela Potter Trigg—were born to the marriage of Rita and Dr. Trigg. Plaintiff also had been formerly married. She had two children by her former husband—Margaret, who married Warren T. McCane and who has one child, Warren Todd McCane, Jr., a minor; and Lidamay, who married Frank B. Nuderscher and has one child, Patricia Ann Nuderscher, a minor. The child and grandchildren of grantor and the children and grandchildren of plaintiff were made parties defendant, the infant defendants being represented by guardians ad litem. Harrison L. Winter has been substituted as a party defendant for M. E. Turner, now deceased, originally a party defendant. The Guaranty Trust Company, designated in the trust indenture to become a cotrustee upon the death of Mr. Potter, and other interested parties were made defendants.

We shall paraphrase and, in some instances, quote the language of the trust indenture, a document of thirty-six typewritten pages, in order to state such terms of the instrument as we deem pertinent to a review of this case. However, we shall not completely set out or make a technical analysis of all of the dispositive language of the instrument, nor shall we precisely point out the cast or devolution of any particular interest upon death of any particular income taker.

The trust instrument, entitled "Revocable Indenture of Trust of Charles Edward Pot-

ter," recited that for the sum of one dollar and for other valuable consideration paid to and received by the party of the first part, Charles Edward Potter (referred to as the "grantor" in the trust instrument, and sometimes herein) "has assigned, transferred, and delivered and does hereby assign, transfer, and deliver to Charles Edward Potter and M. E. Turner and their successors in office as Trustees, certain property which is described in a separate list marked 'Exhibit A' hereto attached and made a part hereof, which said property shall constitute a separate trust estate to be administered as hereinafter provided, and certain property which is described in a separate list marked 'Exhibit B' hereto attached and made a part hereof, which said property shall constitute a separate trust estate to be administered as hereinafter provided." (Exhibits "A" and "B" each listed 150 shares of preferred stock and 279 shares of common stock of Potter Electric Signal & Manufacturing Company. Supplemental Exhibits "A" and "B" certified by Mr. Potter to have been delivered to Charles Edward Potter and M. E. Turner, trustees, on August 14, 1948, each listed an undivided one-half interest in four insurance policies; Supplemental Exhibit "A" also listed $8,-108.22 in cash and Supplemental Exhibit "B" listed $6,706.12. On the face of each of the four Exhibits was the acknowledgment of the receipt of "the above described property" by the trustees, Charles E. Potter and M. E. Turner).

By *Item One* of the indenture, it was provided that the entire net income of the trust estate should until the death of the grantor be paid to him or to his order at such times and in such amounts as he might request or in such amounts as the trustees might deem advisable and proper. The trustees were also authorized to encroach on the corpus to such extent as the trustees might deem advisable to provide for any expenses arising from illness, infirmity or disability of the grantor, or for his comfort and welfare.

By *Item Two* it was provided that upon the death of the grantor the trustees might in their discretion, but were not required to, spend any part or all of the income and corpus of the trust to pay the expenses of the last illness or funeral of the grantor; pay any part or all of the taxes levied on his property or estate, and to satisfy any of his debts.

By *Item Three*, plaintiff, grantor's wife, after grantor's death, was to receive the net income from the property as listed in Exhibit "A" for life. The trustees were also authorized to give plaintiff the net income from the property as listed in Exhibit "B" in such amounts of the net income as "when added to the income, which to the knowledge of the Trustees shall be available for Ida L. Potter from other source or sources" as would "in the opinion of the Trustees provide her the necessary funds to pay the expenses occasioned by her illness, infirmity or disability, either mental or physical, or in order that she may live in a manner which in the opinion of the Trustees shall be consistent with her accustomed standard of living. In deciding on the amount of income to be paid to or applied for the benefit of Ida L. Potter as above provided, the Trustees shall consider Ida L. Potter as the primary beneficiary of such income. The net income from the trust property described in 'Exhibit B' which shall not be paid to or use(d) and applied for the benefit of Ida L. Potter, as above provided, may, in the discretion of the Trustees, be paid to and/or used and applied for the benefit of Grantor's daughter, Rita Potter Trigg, or her children in such amounts and at such time or times, respectively, as when added to the income which to the knowledge of the Trustees shall be available for each of said persons from other sources, will, in the opinion of the Trustees provide each of said persons the necessary funds to pay for his or her education or to pay the expenses occasioned by his or her illness, infirmity or disability either mental or physical, or in order that he or she may live in a manner which in the opinion of the Trustees shall be consistent with his or her accustomed standard of living." Were it to appear to the satisfaction of the trustees that grantor's wife might be in need of funds in excess of net

income to pay expenses of illness, infirmity or disability or in order to live in a manner which in the opinion of the trustees is consistent with her accustomed standard of living, the trustees were authorized to "relieve in whole or in part such need" by encroaching upon the principal of the trust estate. In this connection, the trustees were to give primary consideration to the wife's welfare rather than to the conservation of the trust estate. On the death of plaintiff, all of the property, principal and accumulated income, constituting the trust corpus as designated under Exhibit "A" could be disposed of "free of this trust as Ida L. Potter may direct and appoint in and by her" will, but in the event of a total or partial failure to exercise the power of appointment, then "the unappointed" property should at her death be administered as provided in *Item Four*.

By *Item Four* it was provided that the ("unappointed") principal or corpus as described in Exhibit "A" and accumulated income thereon should be divided by the trustees into two equal shares, one share to be set apart in a separate trust estate for the benefit of grantor's stepdaughter, plaintiff's daughter Margaret B. McCane, and the other share to be set apart in a separate trust estate for the benefit of grantor's stepdaughter, plaintiff's daughter, Lidamay Nuderscher. And the assets described in Exhibit "B" and additions and accumulation of income thereon was to constitute a separate trust estate for the benefit of grantor's daughter; the stepdaughters and daughter to receive such amounts from the net income of their respective share as the trustees should determine "using the yardstick" of "accustomed standard of living." There were other dispositions, of no material significance here, by way of alternative beneficial remainders upon the death of Rita, Margaret or Lidamay, or two or all of them without child or children.

By "Section H" of *Item Four* it was provided that the provisions of the preceding sections of *Item Four* to the contrary notwithstanding, "no trust in this Item Four created shall continue for a period longer than 21 years from and after the death of the last to die of Grantor, Grantor's wife, Ida L. Potter, Grantor's stepdaughter, Margaret B. McCane, her son, Warren Todd McCane, Jr., Grantor's stepdaughter Lidamay Nuderscher, her daughter, Patricia Ann Nuderscher, Grantor's daughter, Rita Potter Trigg and Grantor's grandchildren Peggy Lou Trigg, Joseph Edward Trigg, and Pamela Potter Trigg, and if upon the expiration of the aforesaid period there shall be any property held in any trust estate hereunder then each such trust estate shall thereupon terminate and the Trustees thereof shall thereupon transfer, and deliver, free of trust, to the income beneficiary of said trust estate all the property both principal and income then constituting said trust estate."

By *Item Five* it was provided that, upon the death, after the death of the grantor, of any beneficiary who prior to his or her death had received income from the trust, the trustees were authorized to pay from the principal of the property, from which income had been payable to such beneficiary, such sums as the trustees deemed proper in the circumstances toward the satisfaction of the expenses of the last illness and funeral of the deceased beneficiary. The provisions of the instrument inconsistent with *Item Five* "are subject to and modified by the terms of this *Item Five*."

In *Item Six* the grantor enumerated the extraordinarily broad powers therein given to the trustees to invest, or to sell and reinvest the securities and other property, real and personal, constituting the principal fund or funds at any time or from time to time held or received in trust under the instrument.

By *Item Seven*, if the grantor for any reason should cease to be trustee, the grantor's spouse and The Guaranty Trust Company of Missouri, defendant-respondent herein, should become trustee as successor to the trustee-grantor; but, if for any reason the grantor's spouse should not become trustee or having become trustee should for any reason cease to be trustee then the grantor's oldest child or grandchild

respectively, if twenty-one years of age or older and *sui juris,* should become trustee, and provision was made for other and alternative successor trustees.

*Item Eight* provided the manner of a reappointment of Turner as trustee, should he for any reason cease to be trustee. *Item Nine* empowered grantor while trustee, to remove M. E. Turner from trusteeship by appropriate instrument in writing executed and delivered to Turner. *Item Ten* provided that the trustee Turner should receive compensation as should be determined by agreement in writing, and otherwise provided for compensation of trustees. *Item Fifteen* contained a spendthrift clause. *Item Twenty-three* provided that the trust created and interests thereunder were vested subject to the express condition and reservation "(a) That the Grantor may by instrument in writing (other than *his* will) executed by *him* and delivered to the Trustees, revoke this Indenture of Trust in its entirety or at any time or from time to time amend or alter this Indenture of Trust or revoke portion or portions of this Indenture. In the event of a revocation in its entirety of this Indenture the then principal and income of the trust estate shall be transferred and delivered free of trust, to Grantor or to the order of Grantor, and (b) That the Trustees shall transfer and deliver to the Grantor, free of trust, such portion or portions of the principal of the trust estate as *he* may at any time or from time to time request in writing or if so requested, the Trustees shall transfer and deliver to the Grantor all the then principal and income of the trust estate and the trust shall thereupon terminate, and (c) That in the event any beneficiary of any vested or contingent interest or estate in or to principal or income of this trust estate shall directly or indirectly institute or cause to be instituted any suit, action or proceeding * * * for the purpose of setting aside or nullifying this Indenture * * *, then each and every such beneficiary shall have no further legal or equitable interest or right in and to the income or principal * * *, said right, title and interest being thereby forfeited and this trust shall thereafter be administered as though the death of such contesting beneficiary had then occurred * * *."

By *Item Twenty-four* grantor certified that he had expressed "to legal counsel who prepared this Indenture his desire and purpose to provide for the comfort and welfare of certain persons and to protect said persons against misfortune and· perhaps against their own improvidence and lack of business ability and that he desired to give effect to such plan during his lifetime, and that counsel discussed with him the possibilities of accomplishing said purpose through the medium of an inter vivos trust and the difference between such a trust and a testamentary disposition of the property subject hereto, and that after such discussion he requested the preparation of said Trust Indenture with the intent that his plan would thereby become operative during his lifetime rather than becoming effective at his death, * * *."

The instrument was signed by Charles Edward Potter as party of the first part, and by Charles Edward Potter and M. E. Turner as parties of the second part, and acknowledged by them, July 9, 1948.

As of July 16, 1948, the grantor agreed in writing to pay $25 per month out of the income of the trust as payment for Turner's services as cotrustee. The monthly compensation was to be payable until the grantor's death or until the termination of the contract as in the contract provided, but if Turner continued as cotrustee with a successor cotrustee or cotrustees, he was to receive the fee as provided for a corporate cotrustee. Grantor further agreed to pay an additional fee out of the trust in the sum of $3,000 to be paid $25 every month until the amount of $3,000 had been paid in full. It was recited in the contract that the books and records pertaining to the trust were to be the property of grantor as cotrustee or his successors in trust and upon written demand on Turner and the payment of any amount then due him, the books and records were to be turned over and delivered to grantor or his successor in trust. It was further mutually agreed that

upon the payment to Turner of all monies due him under the contract, the contract could be terminated at any time by grantor by delivery to Turner of a written notice of termination. Turner also could terminate the contract at any time by delivering to grantor a written notice.

An agreement was entered into July 9, 1948, between Charles E. Potter and M. E. Turner, trustees, and Charles E. Potter, Ida L. Potter, and M. E. Turner, copartners, doing business under the name and style of "Charles E. Potter and Company". By the agreement the trustees appointed the partnership as their agent until the agreement should be revoked for the limited purpose (a) of holding in the partnership name such stocks, bonds, notes or other securities and property as agent or nominee (other than commission agent or broker) for the account of the trustees as might from time to time be requested by them, and (b) of otherwise acting with respect to the securities and property in accordance with the instructions of the trustees, it being understood that the power and authority of the partnership was limited to holding the securities and property in the partnership name and otherwise acting with respect thereto as provided in the contract. The contract further provided in detail for the manner in which the partnership as nominee was to act at the request of the trustees. The agreement was signed by Charles E. Potter and M. E. Turner, trustees, and by Charles E. Potter, Ida L. Potter, and M. E. Turner, copartners.

December 9, 1947, Mr. Potter and wife had bought a home for the total purchase price of $65,000. They made a down payment at that time of $35,000, $5,000 of which was paid by plaintiff and $30,000 by Mr. Potter. The title to the property was taken in them as tenants by the entirety, and on the same date a deed of trust was executed securing the payment of the balance of the purchase price. At the time of the death of Mr. Potter the indebtedness secured by the deed of trust had been reduced to $26,253.

Mr. Potter executed his last will and testament August 12, 1948. In his will he directed the payment of his debts and expenses of last illness and funeral, and recited that his jewelry, the household furniture and furnishings, silverware, and other articles of household decoration and use had been given to his wife, Ida L. Potter, during his lifetime, and by *Item Three* of his will bequeathed and devised the residue of his property absolutely to his wife provided, however, that should his wife predecease him, the residuary estate was to go one-half to his daughter, Rita, and one-fourth to his stepdaughter, Margaret and one-fourth to his stepdaughter, Lidamay. He appointed M. E. Turner and The Guaranty Trust Company executors and requested that they should not be required to give bond as such. The inventory of the estate discloses that the estate of Charles Edward Potter, deceased, consisted of personalty of approximately $2,500 in value.

In order to create a valid express trust inter vivos there must be a beneficiary, a trustee, a trust res so sufficiently described or capable of identification that the title thereto can pass to the trustee, and an actual delivery of the trust corpus, its character considered or a legal assignment of the same to the trustee actually conveying present title to the trustee; or retention of the corpus by the owner under circumstances which unequivocally discloses an intent to hold it for the use of another. Atlantic Nat. Bank of Jacksonville, Fla. v. St. Louis Union Trust Co., 357 Mo. 770, 211 S.W.2d 2, and authorities therein cited.

In the instant case the language of the indenture itself purports to be a present transfer of the properties listed in the Exhibits attached. The properties listed were recited to have been, and were thereby "assigned, transferred and delivered" to the named trustees, Charles Edward Potter and M. E. Turner. It was not fatal to the validity of the indenture,

considered as an instrument creating a trust inter vivos, for the grantor to reserve in himself a beneficial life interest. Nor was the operation of the indenture as a valid present transfer of title destroyed by the power which the grantor retained in himself to modify or revoke the trust. Atlantic Nat. Bank of Jacksonville, Fla. v. St. Louis Union Trust Co., supra; Goins v. Melton, 343 Mo. 413, 121 S.W.2d 821; Davis v. Rossi, 326 Mo. 911, 34 S.W.2d 8; Sims v. Brown, 252 Mo. 58, 158 S.W. 624; Restatement, Trusts, § 57. See also St. Louis County Nat. Bank v. Fielder, Mo. Sup., 260 S.W.2d 483.

While the instrument of trust in the case of Atlantic Nat. Bank of Jacksonville, Fla. v. St. Louis Union Trust Co., supra [357 Mo. 770, 211 S.W.2d 6], contained preliminary language indicating a present transfer of the properties comprising the corpus (but upon express conditions) the settlor retained in himself the use, occupancy and enjoyment of all and singular of the properties during his life. The indenture further contained the settlor's specific limitation that " 'from and after' " the settlor's death the trustees should " 'take, hold, manage and control' " the properties. And there was no delivery of the property to the trustees in settlor's lifetime. The retention of the right to use, occupy and enjoy the property during the settlor's life overcame the preliminary language of the indenture, and constituted a retention of title in the settlor as long as he should live; this, and the concurring fact that the trustees were to take, hold, manage and control the property " 'from and after' " settlor's death was fatal to the validity of the instrument considered as creating a trust inter vivos. In the instant case, not only was the language of the trust indenture indicatory of the present transfer of the title to the properties constituting the corpus of the trust, and no other language was contained in the instrument indicatory of an intention to retain title in the grantor, but there was evidence tending to show the certificates of stock listed in Exhibits "A"

and "B" were transferred as shown on the corporate stock book to the partnership nominee. The trustees acknowledged the receipt of all of the properties listed in all four of the Exhibits, and there was evidence tending to show the cash as listed in Supplemental Exhibits "A" and "B" (except for a stated amount, the exception being immaterial here) was transferred to the account of the nominee.

As noted supra, it is contended by plaintiff-appellant that the trust instrument permitted the vesting of beneficial interests beyond the time as fixed by the rule against perpetuities. It is unnecessary for us to resort to an interpretation of the provisions creating these contingent interests or to determine whether these provisions, in themselves, were violative of the rule against perpetuities. By "Section H" of Item Four the grantor clearly provided for the termination of any of the several trust estates provided in the item, and for the transfer free of the trust to the income beneficiary of any trust estate at a time twenty-one years after the death of the named initial and secondary beneficiaries of the respective trust estates. But, it is contended by plaintiff-appellant that Item Five, provided, as it does, that the trustees were authorized to pay from the principal such sum as the trustees deemed proper toward the satisfaction of the expenses of last illness and funeral of a deceased beneficiary, and that Item Five provided, as it does, that the provisions of the instrument inconsistent with Item Five were subject to and modified by its terms, destroyed the effect of "Section H" of Item Four. Based on these premises the theory is advanced that some beneficiary might die at a time precisely twenty-one years after the death of the last of the named primary and secondary beneficiaries, and the interest therefore could not vest, it is said, at the precise time the rule would become applicable and effectual, being as yet deferred, it is said, until the payment of the expenses of the funeral of such deceased beneficiary. But it would seem that in such a remote pos-

sibility of a death precisely twenty-one years after a life in being, a provision for the payment of the funeral expenses of a deceased out of the principal of a trust estate would not prevent the vesting of the title free of the trust. It would seem such expenses of funeral would be but a charge upon the interest and would reduce its quantum and postpone its enjoyment, but should be discharged upon distribution of the corpus by the trustees. Compare Plummer v. Roberts, 315 Mo. 627, 287 S.W. 316.

We have the tentative opinion the indenture of July 9, 1948, was not testamentary in character, but was a conveyance of the corpus to the named trustees with the intent and legal effect of creating a trust inter vivos as the indenture indicates, and as the grantor therein declared. However, in this connection, it remains for us to examine the further contention that the instrument was made in fraud of plaintiff's marital rights in the husband's property.

■ Although in effect conceding the phraseology of the trust indenture and the evidence of delivery of the properties constituting the corpus supports a trust inter vivos, plaintiff urges the evidence demonstrates that Mr. Potter attempted to produce an instrument "which he wanted to look like a valid inter vivos trust but which was really to take effect only at his death" and that, although a trust in name, the instrument was but "a will in reality." Plaintiff cites Atlantic Nat. Bank of Jacksonville, Fla. v. St. Louis Union Trust Co., which case we have examined supra. Plaintiff further stresses evidence tending to show that Mr. Potter, for some time prior to the execution of the indenture experienced weakness, discomfort and pain; had shown the incapacitating effect of some affliction; had expressed that he "wasn't feeling too good and * * * wanted to arrange his affairs"; had said he was "a very sick man" and "didn't think he had much longer to spend on this earth"; had lost his keen interest in his business and in improving the residence property, although theretofore he had been most attentive and

active; had said he was "getting into this trust company in order to avoid inheritance taxes," to "avoid family disputes," and to provide a means by which the "company could continue to operate after he was gone"; and had died with carcinoma, a form of cancer, three months after he executed the trust indenture. Plaintiff-appellant urges the trust indenture as an instrument creating a trust inter vivos was actually testamentary in character, and in "legal" fraud of the wife's marital rights in his property of which he could not have deprived her by a will. Plaintiff relies principally on the case of Merz v. Tower Grove Bank & Trust Co., 344 Mo. 1150, 130 S.W. 2d 611, 617, in which case the general rule, long in effect in this state, was stated—"a conveyance of property by the husband without consideration and with the intent and purpose to defeat his widow's marital rights in his property, is a fraud upon such widow and she may sue in her own right, and set aside such fraudulent conveyance, and recover the property so fraudulently transferred, to the extent of her interest therein." See also Szombathy v. Merz, 347 Mo. 776, 148 S.W.2d 1028; In re Bernay's Estate, 344 Mo. 135, 126 S.W.2d 209, 122 A.L.R. 169; Rice v. Waddill, 168 Mo. 99, 67 S.W. 605; Newton v. Newton, 162 Mo. 173, 61 S.W. 881; Tucker v. Tucker, 32 Mo. 464; Id., 29 Mo. 350; Stone v. Stone, 18 Mo. 389; Davis v. Davis, 5 Mo. 183; Annotation 157 A.L.R. 1184, at page 1196.

■ The fraud of which this court spoke in the Merz case (and in the cases therein cited) was not legal fraud in the sense of fraud to be decisively demonstrated in all cases by the mere fact that a conveyance is a transfer of the husband's personalty in his lifetime and consequently the wife had no marital rights in such personalty which, but for the conveyance in his lifetime, would have belonged to him "at the time of his" death. Section 469.070, RSMo 1949, V.A.M.S. The careful reading of the Merz case, and the cases therein cited, discloses that the voluntary conveyance which the widow may set aside as fraudulent is one executed with the *intent and*

*purpose* to defeat his wife's marital rights. See also, Wanstrath v. Kappel, 356 Mo. 210, 201 S.W.2d 327; and Wahl v. Wahl, 357 Mo. 89, 206 S.W.2d 334. Consequently in the instant case, as in the Merz case, in treating with plaintiff-appellant's contention of fraud, we are concerned only with the husband-grantor's intent. And in determining his intent we may consider and weigh all of the facts and circumstances in evidence.

In the Merz case, there was evidence that defeating the marital rights of the wife was the husband-settlor's sole purpose. He had been possessed of a substantial estate, perhaps in excess of $300,000 in value. The trust conveyance itself made it apparent that he intended to place the major portion of his property beyond the wife's control, and to limit her to an income of $200 per month for life, and no more. She had earned that amount ($200 per month) before her marriage to him and the evidence showed he was obsessed with the purpose of giving her no greater income from his estate. The settlor knew his death was imminent and died two weeks after executing the trust instrument.

 In the instant case, at the time the indenture was executed the husband-grantor was apparently experiencing the debility and intermittent suffering due to the incipiency and progression of the malignancy of cancer, but there is no evidence that he or anyone else knew the cause of his decline. Although he had theretofore been examined by physicians and had been treated for gastric distress, upper belly pain, and constipation, it was not until October 1st, after the execution of the indenture July 9th, that physicians discovered metastases from a carcinoma. When he executed the indenture he no doubt realized his advanced age and his failing health and surmised that he would not live long, but this does not necessarily indicate that he made the indenture in contemplation of impending death, with the view of defeating his wife's marital rights in his property. Naturally one in such a situation would wish to put his affairs in order and look to the future interest and income of himself and family as well as to the present and continuing success of a business one had founded.

 It is true it could not be said plaintiff was the recipient under the trust indenture of the equivalent of her marital rights as provided by statute, and it is true that the present transfer of title to the personalty comprising the corpus of the trust deprived her of her statutory right to the half of his personalty inasmuch as such personalty did not belong to him at the time of his death. But plaintiff-appellant does not maintain and the evidence does not support the conclusion that her husband had been actuated by an intent to defraud her by depriving her of her marital interests. In her brief it is urged there was evidence abundantly establishing that Mr. Potter "was sold the idea that this instrument would save him taxes by setting up an inter vivos trust," although she says the instrument did not have that effect. She further argues that her husband did not know, and Turner and the scrivener, an attorney, should have advised him that the instrument deprived her of her marital rights. She argues by implication that her husband was unduly induced and overpersuaded, and her petition contained allegations of undue influence and coercion on the part of the original cotrustee Turner, now deceased. These allegations were not supported by substantial evidence, and they were in effect abandoned. Here we have no surreptitious or furtive execution of a conveyance. The husband of one of plaintiff's daughters testified that Mr. Potter had given him an outline of "what was to be done," and the witness had told Mr. Potter the "provisions he had made were more than fair." The husband of plaintiff's other daughter did not testify. Furthermore, there is substantial support for the inference that plaintiff knew of the terms of the instrument and originally had tacitly approved. We have noted her signature affixed to the contract of appointment between the trustees and the partnership nominee, a document dated July 9, 1948, reciting that the

partnership was to act as nominee for trustees designated in the trust indenture of July 9th; and we have noted her further acceptance of cotrusteeship as of October 12, 1948. (See *Item Seven* of the trust indenture.)

Although plaintiff was actually given only the net income for life in the approximate half of the corpus, plaintiff had the right to make testamentary appointment as to the approximate half in remainder. The net income produced by the other half of the corpus and, indeed, the whole of the corpus were subject to encroachment to her benefit in circumstances as stated in the indenture. This is not to say that these provident provisions gave to her interests of value equivalent to, or more beneficial to her than would have been her statutory right to the half of her personalty, but this is to say that we think these provisions may be, and they are in this case considered on the question of whether the instrument was with the intent and purpose to defeat her marital rights in his property, and so to defraud her. So considered, and together with the other evidence introduced, there was no substantial evidence tending to show that Mr. Potter had an intent to defraud her. The evidence negatives fraud in the utilization of the indenture as a scheme to deprive plaintiff of her marital rights. The voluminous record reveals convincing evidence of Mr. Potter's affection and provident consideration for plaintiff. We have not prolonged this opinion by a recital and discussion of this evidence; but we again point to the thoughtful consideration of plaintiff's welfare as evidenced by the indenture itself.

The judgment and order of dismissal should be affirmed.

It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.