In the Matter of the ESTATE of August LaGARCE, Deceased.

Bertha LaGARCE, Executrix of August LaGarce, Deceased, Plaintiff-Appellant,

v.

Leona MOULDON and William B. Quinn, Defendants-Respondents.

No. 36129.

Missouri Court of Appeals,
St. Louis District,
Division One.

Nov. 25, 1975.

Motion for Rehearing or Transfer Denied Jan. 23, 1976.

Application to Transfer Denied March 8, 1976.

Martin Schiff, Jr., Webster Groves, for plaintiff-appellant.

James E. Heckel, St. Louis, for defendants-respondents.

DOWD, Judge.

This case is before us for the second time. It was originally initiated as a discovery of assets proceeding in the St. Louis Probate Court in February 1970. The issue was whether a $7000 savings certificate of the Tower Grove Savings and Loan Association was unlawfully withheld by the defendants.

The probate court sustained a motion for judgment on the pleadings filed by plaintiff-executrix and entered a judgment for plaintiff. Upon appeal to the circuit court a judgment was also entered on the pleadings in favor of plaintiff. Upon appeal to this court, we reversed the judgment and remanded the case with directions to enter a judgment in favor of defendants. The case was then transferred to the Missouri Supreme Court. *In Re Estate of LaGarce*, 487 S.W.2d 493 (Mo.banc 1972).

The Supreme Court reversed the judgment and remanded the cause to the trial court in a landmark case that revised the prevailing judicial construction of Missouri's joint account statutes, Sections 362.470 and 369.150 RSMo. 1969. The Supreme Court concluded (at 501):

"While we have reached the same result (although on a different theory) as the court of appeals that the judgment should be reversed, we do not agree with the directions of that court to the trial court to enter judgment for defendants. There has been no trial of this case, and no evidence has been taken, since the judgment was on the pleadings. The plaintiff has not yet had an opportunity to offer evidence, if she has any, on the issue as to whether there was any fraud, undue influence, etc., relating to this transaction, which evidence we have stated would be appropriate. The judgment should therefore be reversed and the cause remanded for further proceedings in accordance with the views herein expressed."

On remand to the circuit court the plaintiff filed an amended petition which asked the trial court (1) to impose a constructive trust on the defendants or (2) to find the savings certificate had been transferred to the defendants in fraud of plaintiff's marital rights. After a lengthy trial the court found for defendants on both counts. We reverse.

The relevant facts will be presented in some detail. An unfortunate series of events began with the separation of Bertha and August LaGarce on August 15, 1969, after twenty-five years of marriage. On that date the plaintiff, Bertha LaGarce, left their home after an argument wherein August told Bertha to leave or he would blow her head off her shoulders and that he had a gun. He also told her to get a divorce.

That same evening August LaGarce went to the bank with his friend John Zakibe. LaGarce removed from his safe deposit box four savings certificates he jointly owned with plaintiff. The four certificates had a total face value of $11,000, and had been issued by the Tower Grove Savings and Loan Association. The certificates had been issued in the years 1951, 1954, 1955 and 1965. August LaGarce told Zakibe he was removing the four certificates because he wanted to change the name on them. The four certificates were in the names of August LaGarce and Bertha LaGarce "as joint tenants with right of survivorship and not as tenants in common."

While still at the bank that evening LaGarce closed out the checking and savings accounts totalling about $11,500 that had been in the joint names of August LaGarce and plaintiff. August LaGarce then put the money in checking and savings accounts

that were in his name only. LaGarce told Zakibe he was transferring these accounts so that only he could touch those assets.

The next day, August 16, August La-Garce and Zakibe went to the Tower Grove Savings and Loan Association. With the help of Mrs. Mayer, an officer of the association, LaGarce surrendered and cashed in the four savings certificates he had removed from his safe deposit box the previous evening. At August LaGarce's direction Mrs. Mayer used the proceeds to issue two new savings certificates. One certificate in the face amount of $4000 was issued to "August LaGarce or John Zakibe, Sr."[1] The second certificate in the face amount of $7000 was issued in August La-Garce's name. On this occasion LaGarce mentioned his marital difficulties to Mrs. Mayer.

On August 21, 1969, August LaGarce again visited Mrs. Mayer at Tower Grove. With him were Mr. and Mrs. James Mouldon. LaGarce instructed Mrs. Mayer to add the names of Leona Mouldon and James Mouldon to the $7000 certificate. LaGarce told Mrs. Mayer he wanted to change the certificate so that if anything happened to him the certificate would belong to the Mouldons. After Mrs. Mayer changed the certificate LaGarce handed the certificate to James Mouldon. Mrs. Mayer then stated to August LaGarce: "The way that certificate is now made out, the person holding it can bring it in and cash it at anytime without the signature or consent of the others, and if anyone whose name is on it dies then it will belong to those that are living." August LaGarce answered, "Yes, that is the way I want it, and I want them to have it and keep it and if I want it I can get it. I know they won't cash it." James Mouldon[2] replied, "If he wants it back he can get it." No consideration was paid by James or Leona Mouldon to have their names put on the certificate. During the August 21 transaction LaGarce again mentioned his marital difficulties to Mrs. Mayer.

During September 1969, LaGarce delivered many assets and important papers to the custody of his attorney, the defendant William Quinn. Quinn was retained by La-Garce from August 30 until September 30 to represent him during his marital troubles. Quinn testified he was given custody of the assets and papers "to make them inaccessible to his wife Bertha LaGarce, and for the purpose of investment and reinvestment, which was not accomplished." Nor did Quinn ever transfer or assign any of LaGarce's assets to a third party. In addition to several real estate and insurance papers, the assets entrusted to Quinn included: (1) $7000 in cash; (2) a cashier's check for $1,942.19, endorsed by LaGarce, which represented the proceeds from redeeming U.S. Series E War Bonds; (3) the passbook of the savings account he had opened in his name on August 15 or 18 (the August 29 balance in the savings account passbook was $5,425.29); (4) a Tower Grove savings certificate in face amount of $4000, issued in 1964 to August LaGarce or John Zakibe, Sr., as joint tenants; (5) the Tower Grove savings certificate that was issued on August 16 to LaGarce and Zakibe as joint tenants, with face amount of $4000; (6) a South Side National Bank Certificate of Deposit dated October 25, 1965, in name of August LaGarce or Bertha LaGarce, with principal sum of $5000; and (7) South Side National Bank Stock Certificates, registered in the name of August LaGarce, valued at $6800. The assets transferred to Quinn thus totalled over $34,000.

During September the LaGarces and their attorneys discussed reconciliation. On September 30 the LaGarces signed a Reconciliation Agreement. One clause said La-Garce "will retransfer all assets into the same condition they were prior to the above recent separation of the parties and will do

---

1. August LaGarce and John Zakibe had another $4000 savings certificate in their joint names since 1964. There was no evidence of how much LaGarce or Zakibe had contributed for this 1964 certificate.

2. James Mouldon died on February 16, 1971.

so within twenty-four hours after signing this agreement." Plaintiff and LaGarce agreed "to retain all of their assets in their individual names alone, or in the alternative, with each other as joint owners. The only exception to this item will be a provision already made for a life long friend of First Party's in the approximate sum of Four Thousand Dollars." The LaGarces also agreed that each would maintain a will making the other party the executor and sole beneficiary of the entire estate. On October 3 August LaGarce executed a will that followed the mandate of the Reconciliation Agreement.

On October 3 plaintiff and August La-Garce went to Quinn's office to pick up the papers and assets he was holding for La-Garce. Later that day LaGarce went with plaintiff and her attorney to see Mrs. Mayer at Tower Grove. Following August La-Garce's instructions she cashed in the $4000 certificate that had been issued on August 16 to LaGarce and John Zakibe. A new certificate for $4000 was then issued in the joint names of August LaGarce and Bertha LaGarce. August LaGarce also wanted to surrender the $7000 certificate that he held jointly with the Mouldons, but Mrs. Mayer said this was impossible because he did not possess the certificate. After August La-Garce unsuccessfully tried to phone the Mouldons, he and plaintiff and and her attorney visited the bank, where August La-Garce's checking and savings accounts were once again put in joint ownership with plaintiff.

The last six days of August LaGarce's life witnessed a series of uncoordinated attempts to have the $7000 certificate returned to him. August LaGarce called Leona Mouldon and asked for the certificate. Mrs. Mouldon at first decided to return the certificate to LaGarce through John Zakibe. But later she decided to retain Quinn so she could leave the certificate with him. Her instructions to Quinn, when she gave him the certificate on October 7, were that he was to return the certificate at his office only to August LaGarce when two conditions were met: (1) August LaGarce signed a receipt for the certificate, (2) August La-Garce paid a sum of $150 for house cleaning, laundry, preparation of meals and miscellaneous services rendered August La-Garce by Mrs. Mouldon and her sister during plaintiff's absence.

On October 8, Mrs. Mayer telephoned Leona Mouldon about the certificate. Mrs. Mayer told Leona Mouldon that August and his wife had been to the office for the purpose of having the certificate changed to the names of August and his wife, but since August did not have the certificate, the change could not be made. Mrs. Mayer asked Leona if she had the certificate and if it would be given to Mr. and Mrs. LaGarce. Leona told Mrs. Mayer that the certificate had been turned over to Quinn "to make it available to August LaGarce and only August LaGarce, and that if he wanted it he, and only he, could pick it up from William B. Quinn at his office." Then Mrs. Mayer told Leona that August was very sick and that it was likely he would die and that he could not go to Quinn's office. Leona then stated that if August was so sick he might die, then she would not turn over the certificate to anyone under any circumstances since it was August's intention that "my husband and I have the certificate if he died and that I would instruct William B. Quinn not to give the certificate to anyone, including August LaGarce, until the outcome of his illness was known." However, Leona was unable to reach Quinn until after August died which was October 9. Leona then instructed Quinn to return the certificate to her. This was done on October 15.

August LaGarce never came to pick up the certificate. He entered the hospital on October 8, 1969, and died the next day. Defendant Quinn, who has never claimed any ownership interest in the certificate, returned the certificate to the Mouldons after LaGarce's death. By written agreement of the parties, Tower Grove is holding the certificate pending our decision.

■ On appellate review of cases tried without a jury we review the case upon both the law and the evidence as in suits of an equitable nature giving due regard to the opportunity of the trial court to have judged the credibility of witnesses. Rule 73.01(3). However, it is our duty to review all the evidence and reach our own conclusion as to the proper judgment to be entered. We are to enter such judgment as the trial court should have entered. *Glaves v. Glaves*, 523 S.W.2d 169, 172 (Mo.App. 1975).

Plaintiff's first contention is that the trial court erred in finding for defendants because the undisputed evidence showed the certificate's ownership was transferred by Mr. LaGarce to the Mouldons in fraud of plaintiff's marital rights.

The controlling statute here is § 474.150 RSMo. 1969 which states:

"1. Any gift made by a person, whether dying testate or intestate, in fraud of the marital rights of his surviving spouse to share in his estate, shall, at the election of the surviving spouse, be treated as a testamentary disposition and may be recovered from the donee and persons taking from him without adequate consideration and applied to the payment of the spouse's share, as in case of his election to take against the will."

■ To determine whether LaGarce's transfer of the certificate ownership was in fraud of plaintiff's marital rights, we must find an intent and purpose on LaGarce's part to defeat plaintiff. *Edgar v. Fitzpatrick*, 369 S.W.2d 592, 601[15] (Mo.App. 1963), modified on other grounds, 377 S.W.2d 314 (Mo. banc 1964); *Nelson v. Nelson*, 512 S.W.2d 455, 459[2] (Mo.App.1974). In determining August LaGarce's intent we may consider and weigh all of the facts and circumstances in evidence. *Potter v. Winter*, 280 S.W.2d 27, 36[7] (Mo.1955). The burden of proving LaGarce's fraudulent intent falls on the plaintiff as surviving spouse when personal property is involved. *Nelson v. Nelson*, supra.

Missouri courts have found several factors that are probative as to a fraudulent intent to defeat the surviving spouse's marital rights. The recent case of *Nelson v. Nelson*, supra, provides an excellent summary and explanation of these factors. Also see *In re Estate of Lowe*, 519 S.W.2d 373 (Mo.App.1975).

■ We have examined the complete record here and have used as our guidelines the various factors that have been identified by the courts as indicative of a fraudulent intent to defraud the spouse. After so doing we conclude that the transfer here was made in fraud of the marital rights of plaintiff.

One highly material element is lack of consideration for the transfer. *Nelson v. Nelson*, supra, [4]. The Mouldons admitted they provided no part of the $7000 to purchase the certificate.

A second important factor is the retention of control by the transferor-spouse over the asset in question. August LaGarce surrendered physical control of the certificate to the Mouldons the same day he had the Mouldons names added to his name on the certificate. But LaGarce did not relinquish all control over the certificate, for he had the oral promise of the Mouldons that they would return the certificate to his possession when and if he needed it. LaGarce's trust was undoubtedly founded both on his second cousin relationship with James Mouldon and his long friendship with the couple. LaGarce's faith in the Mouldons was vindicated when they responded, although in a rather roundabout fashion, to his request for the certificate's return. Thus LaGarce did maintain a certain control over the certificate during his lifetime.[3]

---

**3.** Concerning the transfer of jointly owned personalty, the court in *Nelson v. Nelson*, supra, noted (at 459–60): "Although a transfer by way of joint account is unquestionably valid in the absence of fraud, undue influence, mental incapacity or mistake [citing *In Re Estate of LaGarce*, supra], nevertheless, the intrinsic nature of this type of

A third important factor is whether the amount of the transfer was disproportionate to the value of LaGarce's total estate at the time of the transfer. On August 21, 1969, the day LaGarce transferred ownership of the $7000 certificate from his name to a joint tenancy with the Mouldons, the value of property in LaGarce's name or in the joint names of LaGarce and plaintiff was somewhere between $40,000 and $50,000. Thus the $7000 certificate represented approximately one-sixth of LaGarce's total estate on that day. A number of cases have wrestled with the question whether the value of a particular transfer was disproportionate to the transferor-spouse's total estate. See, e. g., *Nelson v. Nelson,* supra; *In Re Estate of Lowe,* supra; *Edgar v. Fitzpatrick,* supra.

We believe this factor must be reviewed solely in the particular circumstances of each case. Plaintiff here is an elderly woman with no children.[4] There is no evidence of her remarriage. She has not worked since her marriage to LaGarce in 1944. She obviously is in ill health, for she was unable to appear at the trial. Her physician stated she was under treatment for a progressive heart condition that had required extensive hospitalization during 1973. Under these circumstances we find the $7000 transfer in question was disproportionate to LaGarce's total estate at the time of the transfer.

Another factor in determining the intent and purpose motivating the transfer is whether the transferor-spouse made the transfer openly and with frank disclosure. Here the evidence shows that August LaGarce did not make the transfer openly and with frank disclosure. True, there was no concealment of the transfer over a long period of time. Four certificates, totalling $11,000, which were in the name of plaintiff and August LaGarce, were cashed in by him

on August 16, the day following the separation. The certificate in question was issued in August LaGarce's name alone. Then on August 21, the names of Leona and James Mouldon were added to the certificate. During the month of September, August and Bertha LaGarce discussed reconciliation and entered into a reconciliation agreement. Plaintiff first learned about the transfer from August LaGarce sometime in September. However, she believed that Mr. Quinn had this certificate along with the other assets of August. It was not until six days before the death of August LaGarce that plaintiff learned that Quinn did not have the certificate.

The next factor considered by the courts is whether LaGarce was in contemplation of death on the August 21, 1969, transfer date. August LaGarce was suffering from emphysema, a urinary disorder, and possibly a heart condition and died October 9, 1969, but there is no evidence the transfer to the Mouldons was made in contemplation of imminent death. However, contemplation of imminent death by the transferor-spouse is not an indispensable requirement. *Nelson v. Nelson,* supra, [14]; *Resch v. Rowland,* 257 S.W.2d 621, 626 (Mo.1953). As said, fraud may be found by weighing all the facts and circumstances in evidence.

A strong circumstance pointing to LaGarce's fraudulent intent is the timing of the transfer in question. The couple separated on August 15, 1969. That very evening LaGarce removed from his safe deposit box the four certificates, jointly owned with plaintiff, that he later cashed in to buy the $7000 certificate. The next day, August 16, LaGarce cashed in the four certificates at Tower Grove Savings and Loan; he then used the cash to buy a $4000 certificate in joint ownership with John Zakibe

---

joint survivorship ownership is quasi testamentary, and that fact has been treated as a substantial factor for consideration concerning the intention of the transferor-spouse, with transfers of this general nature frequently being referred to as only 'illusory.' [Citations omitted]."

**4.** The LaGarces raised a foster child from the age of sixteen months, but there is no evidence the child has cared for or can care for the plaintiff.

and a $7000 certificate in his name alone. Mrs. Mayer testified that LaGarce had mentioned his marital difficulties during the August 16 transaction. Six days after the separation, on August 21, LaGarce went to Tower Grove to add the Mouldon's name to the $7000 certificate as joint tenants. On this occasion LaGarce again mentioned his marital difficulties to Mrs. Mayer. Although one reason for LaGarce's transfer undoubtedly was his deep personal affection for the Mouldons, we believe both the timing of the transfer and the words he spoke to Mrs. Mayer demonstrate the transfer was ultimately prompted by the separation and was intended to deprive plaintiff of her marital rights in his estate. There is no evidence that the Mouldons (unlike John Zakibe) had ever received a gift of money or joint ownership from LaGarce before August 21, 1969.

Another circumstance closely related to the transfer in question which is indicative of fraudulent intent by LaGarce to defraud his wife is LaGarce's conduct in placing both his own assets and their jointly held assets beyond plaintiff's control between the separation and reconciliation. On August 15 LaGarce and John Zakibe went to the bank, where LaGarce changed joint checking and savings accounts worth about $11,500 to his name. LaGarce told Zakibe he was doing this so he would be the only one who could touch those assets. In September LaGarce transferred possession to Quinn of almost $30,000 worth of assets in his name or held jointly with his wife. Defendant Quinn, in answers to interrogatories, said the purposes of his custody were "*to make them inaccessible to his wife Bertha LaGarce*, and for the purpose of investment and reinvestment, which was not accomplished."

Although LaGarce's acts, and accompanying words, of converting joint assets to his name and then placing most of his joint and solely owned assets in the possession of his attorney do not fall within the prohibition of Section 474.150(1), we believe they do evidence LaGarce's determination to place the assets entirely beyond plaintiff's control. And when LaGarce went one step further and transferred his sole ownership of the $7000 certificate to a joint tenancy with the Mouldons, he acted with the intent and purpose to defraud plaintiff of her marital rights in that portion of his estate.

Although the fraud we must find lies in the intent of LaGarce, we think it appropriate to review the effects of the transfer in question on the reasonable expectation of the plaintiff. Bertha LaGarce had been the joint owner of the four certificates that supplied the money for the $7000 certificate since their purchase in 1951, 1954, 1955 and 1965. For many years, plaintiff must have realized that the jointly held certificates would revert to her sole ownership if LaGarce predeceased her.

Defendants note that (1) plaintiff had voluntarily surrendered to her husband, as he had to her, the right to receive full payment on the certificates when they signed the signature cards for the certificates, and (2) plaintiff had contributed no monetary consideration toward the purchase of the four certificates purchased from 1951–1965.

We agree that plaintiff consented to her husband's right to receive full payment for the four certificates pursuant to the statute (§ 369.150 RSMo. 1969) regulating joint accounts in savings and loan companies. But the statute does not destroy plaintiff widow's reasonable expectation to share in this part of her husband's estate if he predeceased her.

Nor must we forget that a wife brings much more than money to a marriage. Plaintiff rendered the services of a faithful wife to LaGarce during the 25 years of their marriage, except for the six week separation. Commenting on a wife's contribution to a marriage the court in *Nelson v. Nelson*, supra, stated at 463:

"It is not necessary to cite the recent studies by a number of economists undertaking to reduce to a dollar amount the

sheer economic value of such services—we all know without precise computation that these services are very valuable, indeed beyond any mere dollar amount."

Since we reverse the decision of the trial court because of our finding that August LaGarce acted in fraud of plaintiff's marital rights, we do not reach plaintiff's second contention on appeal.

Reversed and remanded with instructions to enter judgment in favor of plaintiff.

WEIER, P. J., and RENDLEN, J., concur.