In the Matter of the ESTATE OF
William M. FROMAN, Deceased.

No. 16841.

Missouri Court of Appeals,
Southern District,
Division Two.

Feb. 4, 1991.

Janelle Calvert House, Gainesville, for appellant.

Lane H. Strother, The Strother Firm, Mountain Home, Ark., for respondent.

SHRUM, Judge.

This case involves a transfer of money in fraud of the marital rights of the surviving spouse. Section 474.150, RSMo 1986. Robert and Lola Johnston appeal from a judgment entered against them in favor of Vinita Froman, the surviving spouse of William M. Froman and personal representative of his estate. We affirm the judgment.

## PROCEDURE BELOW

This litigation began as a claim against the estate of the decedent filed by Kathryn Feist, who sought possession of a Yamaha four-wheel drive vehicle, which she alleged the decedent had given her, and $5,000.00 "for care of decedent and services rendered to decedent from October 1986 to August 1987...." In her capacity as personal representative, Mrs. Froman responded to Ms. Feist's claim and subsequently brought an action to discover assets, naming Ms. Feist and the Johnstons as defendants. Later, Mrs. Froman, as surviving spouse of the decedent and as personal representative of his estate, filed an amended petition, directed solely against the Johnstons, alleging they owed her $29,000.00, an amount she claimed the decedent transferred to Robert Johnston.

The claims of Ms. Feist against the estate and Mrs. Froman against Ms. Feist and the Johnstons were tried together. The trial court denied Ms. Feist's claim, and she is not a party to this appeal. The trial court awarded Mrs. Froman judgment of $29,000.00 plus interest against the Johnstons and imposed an equitable lien against certain real estate which the Johnstons had purchased with a portion of the money received from the decedent. The court appointed a commissioner to sell the real estate if the judgment was not satisfied within 30 days.

## FACTS

The Fromans were married July 2, 1967. In 1972, they signed reciprocal wills and a postnuptial agreement which provided they would not "give away any of their property during their marriage...." The Fromans did not live together after March 29, 1986. The decedent's 1972 will was in effect when he died November 12, 1987. Before he died, the decedent told Mrs. Froman he was going to draw approximately $26,600.00 out of an account with Edward D. Jones & Co. and was "going to spend it."

Following her husband's death, Mrs. Froman began to investigate his affairs. She found that a $26,615.79 check, issued by

Edward D. Jones & Co. on September 30, 1986, payable to the decedent, had been endorsed in blank by him and subsequently endorsed "Bob Johnston." A $2,384.21 check, dated October 4, 1986, drawn on the decedent's bank account, signed by the decedent, and payable to "Bob Johnston," had been cashed. Mrs. Froman testified she had seen a promissory note, signed by the Johnstons, in the amount of $2,384.21, but "[i]t disappeared before I got down there when he passed away."

During her investigation, Mrs. Froman asked Robert Johnston about the $29,-000.00. She testified he replied, "[T]hat was between him and God...." She said he told her, "If you knew what became of the money; it would only hurt you and you ... don't need to be hurt any more." Mrs. Froman found 12 unexplained monthly deposits of $266.00 and one for $133.00 into the decedent's bank account beginning October 1986. She later learned the deposits were checks from the Johnstons.

Robert Johnston testified he received two checks from the decedent totalling $29,000.00. He used $20,000.00 of the money to pay for 9.75 acres which had an unfinished house on it and most of the remainder of the money to finish and remodel the house.[1] Johnston said the decedent refused to take a mortgage from him on the property, even though he offered one. Johnston was the minister at a church attended by the decedent. At trial, when asked why the decedent gave him the money, Johnston replied:

> Because he wanted to, I feel.... He wanted to help me out. He wanted me to go into full-time ministry, and he thought I had a message. And he said I need to be preaching it.

Asked what he gave the decedent in return for the $29,000.00, Johnston said, "All the love I knew how." Johnston also testified he was to pay the decedent "so much a month, every month, as long as he lived." Johnston made monthly payments until de-

cedent's death. A few of the early checks were marked "payment and interest."

Following examination by the attorneys, the court questioned Robert Johnston about his arrangement with the decedent. Johnston said his agreement was that he was to pay the decedent $266.00 monthly so long as the decedent lived. When the decedent died, Johnston testified, his payment obligation would be finished except that he was to "say some good words over" the decedent. Johnston said it was his understanding the decedent meant to do him a favor and the transfer of money was not a business transaction.

The decedent's health was the subject of much trial testimony. When Robert Johnston received the money, he knew the decedent was married and had a serious illness. However, Johnston said when he received the money he had no idea the decedent would die within a little more than a year. Evidence at trial was that the decedent was diagnosed as having kidney failure in 1984 and went on dialysis in the fall of 1985. Mrs. Froman said that during the last year of his life her husband was confused and she questioned whether he knew what he was doing. Ms. Feist, the original claimant, testified, "When he was in the hospital ... he asked me if I would accept his inheritance at his death if he would sign it over to me. And I said, 'We're not going to talk about that now,' because he was too ill." Ms. Feist said the decedent's health was bad during the entire time she worked for him. "[H]e finally got so bad that I did the cooking for him and even carried meals to him." She did laundry for him and frequently transported him for medical care.

## STANDARD OF REVIEW

■ We will sustain the judgment of the trial court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law.

---

1. On several occasions in the Johnstons' brief, the real estate is referred to as the "parsonage." However, the record is devoid of any evidence that the real estate purchased was a "parsonage" for any church. Instead, title to the real estate was taken in the Johnstons' individual names, as tenants by the entirety.

*Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). In determining the sufficiency of the evidence in a court-tried case, an appellate court accepts as true the evidence and reasonable inferences from the evidence that are favorable to the trial court's decree and judgment and disregards all contrary evidence. *T.B.G. v. C.A.G.,* 772 S.W.2d 653, 654 (Mo. banc 1989). Where, as here, no findings of fact have been requested and none made, all controverted facts are considered found in accordance with the result reached. *Misdary v. Misdary,* 737 S.W.2d 476, 479 (Mo.App.1987).

## ISSUES ON APPEAL

The parties' arguments revolve around whether Mrs. Froman may, pursuant to § 474.150, RSMo 1986, recover the money transferred by the decedent to the Johnstons. The Johnstons raise the following points on appeal:

I. The trial court erred in its ruling for wife since the transfer to [the Johnstons] was a valid and enforceable agreement and not a gratuity.

II. The trial court erred in its ruling for wife since wife failed to sustain her burden of proof on the elements of fraudulent intent.

■ Reproduction of the Johnstons' points on appeal in this opinion should not be taken as an endorsement of their compliance with Rule 84.04(d) or *Thummel v. King,* 570 S.W.2d 679 (Mo. banc 1978). Because of the considerable overlap in the points on appeal, we consider them together.

## ANALYSIS AND DECISION

Section 474.150 provides in pertinent part:

Any gift made by a person ... in fraud of the marital rights of his surviving spouse to share in his estate, shall, at the election of the surviving spouse, be treated as a testamentary disposition and may be recovered from the donee and persons taking from him without adequate consideration and applied to the payment of the spouse's share....

Section 474.150, RSMo 1986, is a codification of the common law action of fraud of marital rights. *Estate of Bernskoetter,* 693 S.W.2d 249, 252 (Mo.App.1985). To determine if fraud of marital rights occurred, the court examines the intent of the transferring spouse. *Id.* at 252; *Matter of Estate of LaGarce,* 532 S.W.2d 511, 515 (Mo.App.1975). The burden of proving the decedent's fraudulent intent in transferring personal property is on the surviving spouse. *Id.* In determining the decedent's intent, the court may consider and weigh all the facts and circumstances in the case. *Id.*

■ Missouri courts have recognized various factors as indicative of an intent to defraud a spouse, including (a) a lack of consideration for the transfer, (b) retention of control by transferor-spouse over the asset in question, (c) a transfer of disproportionately high value when compared to transferor's total estate, (d) a lack of open and frank disclosure by the transferor-spouse to the surviving spouse about the transfer, and (e) contemplation by the transferor-spouse of his imminent death. *Nelson v. Nelson,* 512 S.W.2d 455, 459–63 (Mo.App.1974). Unlike a common law action in fraud, in which each element must be proven, *see, e.g., Heberer v. Shell Oil Co.,* 744 S.W.2d 441, 443 (Mo. banc 1988), it is not essential in an action under § 474.150 that every indicator discussed in *Nelson* be proven to sustain a finding of fraudulent intent. As the court in *Estate of LaGarce* points out, the indicators in *Nelson* serve as "guidelines" to a court faced with determining the intent of a deceased person. 532 S.W.2d at 515.

■ First we examine whether there was consideration for the transfer. The Johnstons argue that their $266.00 monthly payments to the decedent during his lifetime and the agreement to conduct funeral services for him constitute consideration and the $29,000.00 was not a gift. Such argument flies directly in the face of unambiguous judicial admissions in the Johnstons' pleadings and testimony. In her separate answer to Mrs. Froman's amended petition, Lola Johnston said she had no

transactions with the decedent and any transactions were "strictly between her husband, Robert L. Johnston, and the deceased." Lola Johnston's answer constitutes a judicial admission of lack of knowledge about whether the transfer of the $29,000.00 was a gift or whether there was consideration for the transfer. In Robert Johnston's separate answer, he said that *"any monies given to him by deceased were a gift."* The Johnstons are bound by these judicial admissions.

A party to a suit is absolutely bound by statements adverse to his interest contained in his pleadings on which the case is tried.... A party is precluded from denying or contradicting any fact contained in such an admission in his pleadings. *Huber v. Western & Southern Life Insurance Company of Cincinnati, Ohio,* 341 S.W.2d 297, 300 (Mo.App. E.D.1960); *Kelley v. Briggs,* 290 S.W. 105, 107 (Mo.App.W.D.1927). The narrow exception to this rule is where the party seeking to rely upon an admission made in a pleading of another party has actually introduced evidence contrary to the admission. In that case, the issue is for the trier of fact to decide. *Jenni v. Gamel,* 602 S.W.2d 696, 699 (Mo.App.E. D.1980); *Plemmons v. Pevely Dairy Co.,* 241 Mo.App. 659, 233 S.W.2d 426 (E.D. 1950).

Mo. Sources of Proof, § 3.5 (MoBar 3rd ed. 1989).

Defendant Robert Johnston's testimony that he understood the deceased was doing him a favor and the transfer was not meant to be a business transaction is consistent with his judicial admission in his pleadings that the $29,000.00 was a gift. Although it might be argued that the "narrow exception" noted above applies because Mrs. Froman introduced evidence about monthly payments to the decedent from the Johnstons, the matter of consideration was for the trier of fact to decide. In light of the trial court's questioning of Robert Johnston, the court reasonably could have concluded there was no consideration for the cessation of the Johnstons' payment obligation. There was substantial evidence at trial to support the determination implicit in the trial court's judgment that there was no consideration for the transfer.

The decedent did not retain the degree of control typically found in joint bank account cases, see, e.g., *Estate of Fleischmann v. Fleischmann,* 723 S.W.2d 605, 611 (Mo.App.1987); *Bernskoetter,* 693 S.W.2d at 252; *Nelson,* 512 S.W.2d at 459, nor in revocable inter vivos trust cases, see, e.g., *Edgar v. Fitzpatrick,* 369 S.W.2d 592 (Mo.App.1963), modified on other grounds, 377 S.W.2d 314 (Mo. banc 1964). Nevertheless, we believe the decedent in the case before us did retain at least a modicum of control over the money.

In *Estate of LaGarce,* the decedent cashed in savings certificates which were in his name and his surviving spouse's name. With a portion of the proceeds he purchased a $7,000.00 savings certificate in his name alone. Five days later he instructed the issuing bank to add the names of Leona and James Mouldon to the certificate. Decedent gave the certificate to James Mouldon who, in the presence of a bank officer, said, "If he wants it back he can get it." 532 S.W.2d at 513. The court of appeals concluded that decedent "did maintain a certain control over the certificate during his lifetime" because of "the oral promise of the Mouldons that they would return the certificate to his possession when and if he needed it." *Id.* at 515.

*Estate of LaGarce* sets a low threshold for a finding of retention of control, and the degree of control maintained by the decedent in the case before us meets this threshold. Mr. Froman retained some control over the money when he conditioned its transfer to Robert Johnston on Johnston's making a $266.00 monthly payment to the decedent for his lifetime. The decedent retained the benefit of the money during his life in addition to designating its disposal upon his death. The trial court could have found that the decedent's arrangement with Robert Johnston indicated an intent on the decedent's part to deprive Mrs. Froman of the money.

On the "disproportionate share of estate" issue, the Johnstons correctly point to a lack of evidence in the record of the size of the decedent's estate. The estate inventory was not placed in evidence. During trial, the Johnstons' attorney used the estate inventory during cross-examination of Mrs. Froman, but the inventory was not offered into evidence by either party. Attached to Mrs. Froman's brief as exhibit A (without objection or motion to strike from the Johnstons) is an "Inventory and Appraisement" for the decedent's estate. Exhibit A bears the file stamp of the Probate Division of the Circuit Court of Ozark County and appears to be the inventory of the decedent's estate. The document shows the $29,000.00 transfer constituted more than one-half of the decedent's estate. However, because the inventory was not in evidence, this court declines to consider the element of disproportionate size of the transfer in reaching its decision.

There was evidence that the decedent did not make frank and open disclosure to Mrs. Froman about the transfer. When the Fromans discussed the Edward D. Jones & Co. account, the decedent told his wife he was going to withdraw the money and spend it; he did not tell her he was going to give the money to his minister. It was only after Mrs. Froman received from Edward D. Jones & Co. a photocopy of the negotiated check to the decedent that she discovered the disposition of the proceeds from the Jones & Co. account. It was only after Mrs. Froman began her investigation into the decedent's financial affairs that she learned of the monthly deposits into his bank account, and it was later still when she discovered the deposits were the checks from the Johnstons. The decedent's refusal to take a mortgage on the Johnstons' property, which, if recorded, would have made a public record of some transaction between them, could have been taken by the trial court as additional evidence of the decedent's desire to keep the transaction confidential.

Finally, substantial evidence existed that the transfer was made by the decedent in contemplation of death. For example, when the transfer was made, the decedent said to Robert Johnston, "After I'm gone, you say a few good words over me." The record is replete with evidence of the decedent's health problems. The decedent's inquiry of claimant Feist, while he was hospitalized, if she would accept his money at his death, could have been viewed by the trial court as evidence of decedent's contemplation of death. Sufficient evidence exists that the decedent made the transfer in contemplation of death to indicate fraudulent intent on his part.

There is, in this case, evidence of the existence of four of the indicators listed in *Nelson*, 512 S.W.2d 459–63. Moreover, the evidence at trial need not be analyzed solely in terms of the indicators discussed in *Nelson*. The decedent's arrangement with Robert Johnston, coupled with the decedent's offer to claimant Feist of "his inheritance at his death," could have been viewed by the trial court as evidence, irrespective of the *Nelson* indicators, of the decedent's intent to dispose of his estate to someone other than Mrs. Froman. The facts and circumstances of this case, *see Estate of LaGarce*, 532 S.W.2d at 515, provide substantial evidence in support of the trial court's judgment.

Judgment affirmed.

FLANIGAN, C.J., and HOGAN, J., concur.