(824 P.2d 213)
No. 66,187

LUCILLE W. JARVIS *Appellee*, v. MARK C. JARVIS, individually, and as Trustee for The M. L. Jarvis Revocable Family Trust Agreement; RALPH J. JARVIS; JOHN C. JARVIS; and JOAN E. (JARVIS) BROWN, *Appellants*.

250

Opinion filed December 6, 1991.

*Thomas J. Kennedy*, of Kennedy, Berkley, Yarnevich & Williamson, Chartered, of Salina, for the appellants.

*J. Stan Sexton* and *Larry G. Michel*, of Hampton, Royce, Engleman & Nelson, of Salina, for the appellee.

Before BRISCOE, C.J., DAVIS, J., and DAVID F. BREWSTER, District Judge, assigned.

DAVIS, J.: Lucille W. Jarvis, the surviving spouse of Melvin L. Jarvis, brought this action against Melvin's four adult children by a previous marriage to set aside his *inter vivos* revocable trust and pour-over will so that she might elect to take her statutory share of his estate. The adult children claim that the court erred by allowing the jury to consider the question of the validity of the trust since, according to their contention, this is a legal question. They further claim that Lucille Jarvis is estopped by her course of conduct from asserting the defense of nonconsent. By answer to special questions, the jury concluded that Lucille Jarvis did not consent to the transfer of property to the trust and did not consent to Melvin Jarvis' will. The adult children appeal from the judgment in favor of Lucille Jarvis. We affirm.

Melvin L. Jarvis died on June 4, 1989. He was survived by his spouse, Lucille W. Jarvis, and four adult children by a previous marriage, Ralph J. Jarvis, Mark C. Jarvis, John C. Jarvis, and Joan E. Brown.

Melvin Jarvis executed his last will on March 18, 1983, which was admitted to probate. At the same time, he executed the M.L. Jarvis Revocable Family Trust Agreement. On the same date, Lucille executed the Lucille W. Jarvis Revocable Family Trust Agreement and her last will.

Attached to the M.L. Jarvis Revocable Family Trust Agreement was Schedule A purporting to convey "[a]ll property, real and personal, now had or hereafter acquired by the Settlor . . . unto M.L. Jarvis, Trustee." Schedule A was executed, acknowledged, and accepted by M.L. Jarvis. Also appearing is the signature of Lucille W. Jarvis under the statement "Confirmed this 18th day of March, 1983."

The Jarvis estate plan was developed with the aid of a financial planner, Frank E. Roth. Roth met with Melvin and Lucille twice and recommended the plan involving revocable trusts and pour-over wills. Roth was not a lawyer and testified that he did not advise Lucille of her statutory rights of inheritance. Lucille also testified that Roth did not advise her of these rights. However, Roth's written recommendations to Melvin and Lucille contained a statement showing how property would pass without a will.

Upon the advice of Roth, Melvin and Lucille contacted their attorney, Peter Peterson, who drafted the necessary documents. According to Peterson, he discussed the plan with them and confirmed the wishes of each. Peterson testified that Lucille wanted her property to pass to her children and Melvin wanted the bulk of his property to pass to his children. He stated that the notes from his file indicated that he discussed with Melvin and Lucille the need for each to consent to the will of the other for the property to pass as they desired. However, according to Lucille, Peterson did not explain her spousal rights of inheritance or that she had a right to inherit from Melvin unless she consented to his will.

Peterson prepared drafts of pour-over wills and trusts following the plan recommended by Roth. Peterson sent the drafts for Melvin and Lucille to Melvin. Peterson also sent a copy of the drafts to Roth. Approximately $295,000 in assets was to be transfered to Lucille's trust. The assets included bearer bonds valued at $100,000, a house with a net value of $65,000, a note from Mark Jarvis for $50,000, and term life insurance on Melvin's life with a value of $80,000. Approximately $900,000 in Melvin Jarvis Construction Company, Incorporated (MJCCI) stock was to be transfered to Melvin's trust. Melvin was the owner and president of MJCCI, which built grain elevators, flour mills, schools, bridges, and buildings.

When Roth received his copy, he sent a letter to Melvin at his business address raising questions including whether Lucille would have any income from the Qualified Terminable Interest Property Trust because the stock was not liquid and did not pay a dividend. Roth did not contact Lucille.

On March 18, 1983, Melvin and Lucille again met with Peterson at his office for the signing of the trusts and wills. According to Lucille, there was no discussion concerning the trusts and wills before the signing and Peterson did not advise her of spousal rights of inheritance. Melvin and Lucille each signed their own trusts and wills. Lucille also signed Schedule A to Melvin's trust beneath the words "Confirmed this 18th day of March, 1983." According to Peterson, Schedule A was a transfer document that was intended to transfer property into the trust. Lucille testified that she intended "confirmed" to mean that "it was Mel's wishes, that this was what he wanted"; however, by signing Schedule A, she did not intend to consent to Melvin's will.

Peterson testified that he inquired and found out that Melvin and Lucille had reviewed and were comfortable with the drafts. He also testified that he told both Melvin and Lucille that Schedule A was where they consented to and confirmed each other's plans. According to Peterson, Melvin and Lucille were fully aware that the confirmation was a consent. Peterson testified that neither Lucille nor Melvin had any hesitancy in signing the confirmation.

Immediately following the signing of the trusts and wills and at Peterson's direction, Melvin and Lucille signed deeds that changed the ownership of their home from joint tenancy with right of survivorship to Lucille's trust. The deeds were not recorded but were kept in escrow at the bank.

A few days after the signing, Peterson sent a letter to Melvin with a copy to Roth explaining what had happened and what needed to happen. In response to Peterson's letter, Roth wrote to Melvin and Lucille suggesting they find some way to convert the MJCCI stock to cash upon Melvin's death. Roth advised Melvin and Lucille that in order for their trusts and wills to be effective, they needed to transfer their property to the trusts in the manner and amounts suggested in Peterson's letter. According to Peterson, Melvin's property was transferred to his trust and Lucille's property was transferred to her trust upon the signing

of the trust agreements and schedules. Peterson testified that nothing more needed to be done by Melvin and Lucille but that more may be needed to put third parties on notice.

After the documents were signed, Melvin and Lucille did not have any discussions about the trusts.

According to Lucille, Melvin did not do business in the name of the trust or as trustee of the trust. In 1987, First National Bank demanded full payment of a note due it from MJCCI. Melvin sold $80,000 of securities that Lucille had purchased before marrying Melvin and used the money as payment on the bank note. Melvin made gifts of MJCCI stock to his children and grandchildren annually over several years. The MJCCI stock was supposed to have been in Melvin's trust. Melvin paid his son Jeff's child support of $300 per month for three years. When Jeff moved and stopped making payments on his house, Melvin made the monthly payments until the note was paid off. According to Lucille, nothing in the way Melvin handled their affairs changed after they signed the trusts.

Melvin died in June 1989. At the time of Melvin's death, the MJCCI stock left in his estate was valued at $206,712.

In July 1989, during a phone conversation with her brother-in-law, a retired banker in Kansas City, Lucille told him that she had not received anything from Melvin's estate. When her brother-in-law explained to Lucille that she may have a right to elect against Melvin's will, Lucille learned for the first time of her spousal rights of inheritance. Lucille then petitioned the court to probate Melvin's will, signed an election against the will, and filed this lawsuit.

Following a trial, the jury returned a special verdict finding (1) Lucille did not consent to a transfer of property to Melvin's trust; (2) Lucille did not consent to Melvin's will; (3) Melvin made an explicit declaration and had the intent to create a trust; (4) Melvin's trust did not contain definite property or subject matter; and (5) Melvin did not accept and handle the trust property as a trustee of a trust. The trial court entered judgment in favor of Lucille and ordered Mark Jarvis, as successor trustee of Melvin's trust, to provide an accounting of the trust property and to transfer all property to Lucille, as executrix. The trial court also ordered Mark, Ralph, John, and Joan to account for and transfer

to Lucille, as executrix, all property distributed to them as beneficiaries of Melvin's trust. This appeal follows.

The adult children argue that Lucille should be estopped from maintaining that she did not consent to Melvin's trust and pour-over will because her course of conduct throughout the estate planning was one of acquiescence and because she accepted the benefits of the plan. They further argue that even if Lucille's consent was based on a willingness to act unintelligently, the consent is nevertheless valid under *In re Estate of Ellis*, 168 Kan. 11, 29, 210 P.2d 417 (1949). Finally, they argue that Lucille consented to the last will of Melvin by her confirmation of the entire plan or, at the very least, that the question of whether her confirmation was a consent was a question of law to be decided by the court, not the jury.

"Equitable estoppel is the effect of the voluntary conduct of a person whereby he is precluded, both at law and in equity, from asserting rights against another person relying on such conduct. A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. There can be no equitable estoppel if any essential element thereof is lacking or is not satisfactorily proved. Estoppel will not be deemed to arise from facts which are ambiguous and subject to more than one construction, and nothing can be supplied by mere intendment." *Tobin Constr. Co. v. Kemp*, 239 Kan. 240, 243-44, 718 P.2d 302 (1986).

The adult children claim that undisputed facts set forth in their brief call for but one conclusion—that Lucille may not at this time say she did not consent to the trust of Melvin. We have considered those facts and conclude that factual issues involving the consent to the trust and will remain. Lucille contends that Roth did not advise her of her statutory rights. This fact is undisputed, for Roth acknowledges that he is not an attorney and that he did not give Lucille legal advice. He did make reference to those rights in the written plan submitted to Lucille and Melvin but he gave no advice. Peterson, the attorney drawing the instruments, testified that he advised Lucille of her rights, but Lucille denies that such advice was given. Lucille signed Schedule A, attached to Melvin's trust, under the following text: "Con-

firmed this 18th day of March, 1983." Lucille contends that by her signature, she merely intended to confirm what Melvin was doing.

Given the opposing and conflicting evidence on the very important question of whether Lucille consented to the transfer of property to the trust and the fact that the term used was confirmed, not consented, it is not surprising that the trial court denied all defense motions seeking a verdict on the basis of estoppel. Instead, the court properly submitted in the form of a question to the jury whether Lucille consented to the transfer of property to Melvin's trust and, further, whether she consented to the will of Melvin.

The actions of Melvin and Lucille in the years following the creation of the trust did not indicate or represent to the children the existence of the trusts. According to Lucille, Melvin conducted their business as he always had. Melvin did not do business as trustee for his trust. Melvin's checking account at the time of his death was in his own name. There is no evidence that the stock certificates Melvin gave to his children before his death indicated he was acting as trustee. The signing of the documents and the actions of Melvin and Lucille did not induce the adult children to act to their prejudice.

The adult children also argue that Lucille may not deny her consent because she made no effort to inform herself and demonstrated a willingness to act unintelligently. In making this argument, the adult children rely on *In re Estate of Ellis*, 168 Kan. 11. A critical difference between our case and *Ellis* is that in *Ellis*, the spouse knew that her consent would be required. Lucille testified she did not know her consent was required. *Ellis* provides little, if any, support for the adult children. Moreover, Peterson represented Melvin *and* Lucille. Melvin and Lucille sought out legal advice from Peterson for their estate planning. Lucille made an effort to inform herself of her legal rights during the estate planning process. A review of the circumstances does not show that Lucille was willing to act unintelligently.

The adult children finally argue that whether Lucille's written confirmation was a consent was a question of law rather than a factual issue for the jury. The adult children rely on the case of *Larned v. Larned*, 98 Kan. 328, 158 Pac. 3 (1916), to support

their contention that Lucille by her signature of confirmation consented as a matter of law to the transfer of property to Melvin's trust and consented to the will. In *Larned*, the husband made a statement in his last will that "I confirm to her [his spouse], her right to dower. in all the real estate of which I shall die seized." 98 Kan. at 332. The court defined the term confirm to mean "to make firmer, to strengthen, sanction or ratify." 98 Kan. at 333. Unlike *Larned*, we deal with the question of whether the surviving spouse, by signing a confirmation, knowingly waived her statutory right to elect against her deceased husband's will. The fact that Lucille claims that she had no knowledge of any such rights at the time of the execution of the will and the trust and merely intended by her signature to acknowledge what Melvin was doing raises factual questions concerning the use of the word confirm. *Larned* provides no basis for concluding in this case that Lucille's signature as a matter of law was a consent to the entire estate plan.

It has long been the rule in Kansas that if one spouse transfers property without the consent of the other spouse and retains the power of revocation, the transfer is "fallacious, illusive and deceiving, and will be considered as fraud on the rights of the widow where she is deprived of her distributive share." *Ackers v. First National Bank of Topeka*, 192 Kan. 319, 333, 387 P.2d 840 (1963). In *Newman v. George*, 243 Kan. 183, 755 P.2d 18 (1988), the court affirmed the rule of *Ackers*, noting that "*Ackers* has been the law of this state since 1963. Thus, it is a part of the body of law utilized by estate planners since that time." 243 Kan. at 189. As further noted in *Newman*, "[T]here was no need to prove fraud. It was implied from the creation of the revocable trust without consent." 243 Kan. at 189.

For the transfer of Schedule A property to Melvin's trust to be effective, the consent of Lucille was essential under *Ackers*. The use of the word confirmed does not establish such consent, especially when consent to the transfer is denied and the evidence is conflicting on this issue. The court left the resolution of the issue to the jury, which decided that Lucille did not consent to the transfer of property to Melvin's trust.

The adult children contend that the question of the validity of the trust was a question of law to be determined by the court

and not the jury. We need not resolve this question because we have concluded that the issue of consent to the transfer of property to the trust and consent to the will was submitted to the jury under proper instructions and resolved against the adult children. Under these circumstances, even if the trial court may have erred in submitting the question of the validity of the trust under *Pizel v. Pizel*, 7 Kan. App. 2d 388, 643 P.2d 1094, *rev. denied* 231 Kan. 801 (1982), to the jury, the error has no effect upon the disposition of this case. The transfer of property to Melvin's trust was ineffective under *Ackers* and *Newman*; Lucille did not consent to Melvin's will so she is now in a position to elect against his will as held by the trial court.

Affirmed.