William G. BRIGGS, Appellant (Plaintiff),

v.

WYOMING NATIONAL BANK OF CASPER, Norma Jean Burrell, Arthur Ernest Hageman, Jr., William Ethbert Hageman, James Leland Hageman, Doris Elaine Rohrer, Leroy Leonard Sanford, Harry Herman Sanford, Pauline Sanford Middleton, Marjorie S. Budge, Hazel E. Staley, Rudy E. Sanford, Charlene Mary Bressler, Lorraine Broyles, Joanne Eileen Herrod, Dorothy L. Green, Selma Charlotte May, and Norma Jean Burrell as the personal representative of Mabel Doris Hageman, deceased, Appellees (Defendants).

Norma Jean BURRELL, Arthur Ernest Hageman, Jr., William Ethbert Hageman, James Leland Hageman, Doris Elaine Rohrer, Leroy Leonard Sanford, Harry Herman Sanford, Pauline Sanford Middleton, Marjorie S. Budge, Hazel E. Staley, Rudy E. Sanford, Charlene Mary Bressler, Lorraine Broyles, Joanne Eileen Herrod, Dorothy L. Green, Selma Charlotte May, and Norma Jean Burrell as the personal representative of Mabel Doris Hageman, deceased, Appellants (Defendants),

v.

William G. BRIGGS, Appellee (Plaintiff).

Nos. 91–106, 91–107.

Supreme Court of Wyoming.

June 23, 1992.

William L. Miller of Miller and Fasse, Riverton, Louis L. Walrath, Thermopolis, and Holly B. Brown, Bozeman, for William G. Briggs.

W. Thomas Sullins II of Brown & Drew, Casper, for Wyoming Nat. Bank of Casper.

Jeffrey A. Tennyson, Jackson, for the Family Share Beneficiaries.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

MACY, Justice.

William G. Briggs commenced a declaratory judgment action to declare the trust agreement of his deceased wife, Eva G. Topping Briggs, invalid, to include the trust assets in her probate estate, and to declare the rights of the beneficiaries under her trust agreement and will. The court entered a summary judgment for the trustee and the beneficiaries of the trust (the Family Share Beneficiaries), declaring that the trust agreement was valid and that the trust provisions were enforceable with the exception of the "no contest" clause.

We affirm in part and reverse in part.

Mr. Briggs raises the following issues for review on direct appeal:

A. The Eva G. Briggs Living Trust violates the elective share provisions of W.S. § 2–5–101 et seq.

B. The Eva G. Briggs Living Trust is testamentary in nature and is invalid for failure to meet the statutory requirements of a will.

C. The Eva G. Briggs Living Trust is void as an illusory transfer of property.

D. The Eva G. Briggs Living Trust is fraudulent and void as a violation of public policy.

Wyoming National Bank of Casper, now known as Norwest Bank Wyoming Casper, N.A., trustee of the living trust, generally states that the issue presented for review in this appeal is:

Whether the court below was correct in granting summary judgment in favor of [the trustee and the Family Share Beneficiaries] and decreeing the validity of the Eva G. Topping Briggs Living Trust based upon its dual findings that there is no genuine issue of material fact and that [the trustee and the Family Share Beneficiaries] are entitled to judgment as a matter of law.

The Family Share Beneficiaries maintain that the following issues are ripe for review on direct appeal:

Are [the trustee and the Family Share Beneficiaries] entitled to summary judgment that the trust in question is valid and enforceable under Wyoming law where there are no genuine issues of material fact in evidence?

Does the Eva G. Topping Briggs Living Trust violate Wyoming's elective share provisions?

Does the Eva G. Topping Briggs Living Trust constitute a testamentary document?

Does the Eva G. Topping Briggs Living Trust constitute an illusory transfer of property?

Does the Eva G. Topping Briggs Living Trust work a fraud on the rights of [Mr. Briggs] and thus violate Wyoming's public policy[?]

Has [Mr. Briggs] effectively ... waived any right that he may have to contest the validity of the Eva G. Briggs Living Trust by his express written consent thereto?

Is [Mr. Briggs] estopped by his actions from contesting the validity of the Eva G. Topping Briggs Living Trust?

The Family Share Beneficiaries raise the following issue on cross-appeal:

Did the district court commit reversible error after it refused, on public policy grounds, to enforce the no-contest provisions of the trust agreement when no issues of material fact existed?

No genuine issues of material fact exist. Mr. Briggs and Mrs. Briggs were married to each other for approximately twenty years during their later years in life. Mr. Briggs had four children from a previous marriage. Mrs. Briggs had no children of her own. After their marriage, the Briggses each maintained separate ownership of the property they had acquired before their marriage and kept their accounts, holdings, and income separate from one another.

In late 1984 or early 1985, Mrs. Briggs' attorney prepared her will, her living trust agreement, and a warranty deed to convey her real property into a trust. Under the terms of the trust agreement, Mrs. Briggs named herself as the principal trustee and retained the right to receive the income and principal of the trust as she deemed appropriate, as well as the right to alter, amend, or revoke the trust agreement during her

lifetime. The trust agreement provided that Mr. Briggs would receive a one-seventeenth share of the "Family Share" assets. The trust agreement also provided:

> William G. "Bud" Briggs, for and in consideration of the gift set forth herein to him and for and in consideration of the natural love and affection for his wife, Eva Topping Briggs, Settlor herein, *hereby joins in the establishment of this trust for the purpose of waiving any and all right he may have to contest the establishment of the trust or the transfer of any property of his wife as Settlor to the trust.*

(Emphasis added.) The only provision made for Mr. Briggs pursuant to the terms of Mrs. Briggs' will was the gift of minor household furniture, goods, and appliances. The gross value of Mrs. Briggs' living trust and the probate estate was approximately $900,000. Mr. Briggs filed a petition to take his elective share of the estate.

Both Mr. Briggs and Mrs. Briggs signed the agreement creating the living trust. Before he signed, Mr. Briggs was advised and encouraged by Mrs. Briggs and her attorney to see his own attorney to review the agreement and the proposal. Mr. Briggs affirmatively stated that he did not want to see another attorney and that he consented to whatever Mrs. Briggs desired to do, and he voluntarily signed the agreement and the deed. Mr. Briggs now states that he did not read or understand the documents, that he signed them without being advised of the consequences of his signature, but that he was assured Mrs. Briggs was leaving everything to him.

### Waiver

■ The Family Share Beneficiaries contend that Mr. Briggs' written and signed waiver of his right to contest the establishment of, and the transfer of the property into, the trust was a valid and enforceable waiver. We agree.

We stated in *Ranger Insurance Company v. Cates*, 501 P.2d 1255 (Wyo.1972), that a waiver must be manifested in some unequivocal manner. The unrefuted evidence is that, before Mr. Briggs signed the written waiver, Mrs. Briggs and her attorney recommended to him that he review the contents of the trust agreement with another attorney. Mr. Briggs did not equivocate. He affirmatively stated that he did not want to see another attorney and that he consented to whatever Mrs. Briggs desired to do. Mr. Briggs voluntarily signed the document. He cannot now effectively complain that he did not understand what he was doing because he did not read the agreement or have the advice of an attorney. In Wyoming:

> "The rule is that the one who signs a paper, without reading it, if he is able to read and understand, is guilty of such negligence in failing to inform himself of its nature that he cannot be relieved from the obligation contained in the paper thus signed, unless there was something more than mere reliance upon the statements of another as to its contents...." *Sanger v. Yellow Cab Co., Inc.,* Mo.1972, 486 S.W.2d 477, 481.

*Laird v. Laird,* 597 P.2d 463, 467 (Wyo. 1979). *See also First State Bank of Wheatland v. American National Bank,* 808 P.2d 804 (Wyo.1991). Mr. Briggs is bound as a matter of law by the written waiver, which waiver disposes of the other issues raised by Mr. Briggs.

### "No Contest" Clause

■ The Family Share Beneficiaries filed a counterclaim which alleged that a violation of the "no contest" clause in the trust agreement occurred and which prayed that Mr. Briggs take nothing from the trust as a result of his contest. The "no contest" clause provided in relevant part:

> The assets of the Family Share shall be distributed in cash free of the obligations of this Trust equally to the following named beneficiaries, or their heirs surviving at the time of distribution, provided that if any of the following named beneficiaries shall contest the establishment of this trust or take any legal action to set aside or challenge this trust and/or the distribution of income set forth herein, then the gift to him or her shall fail and his or her share shall be distributed amongst the remaining bene-

ficiaries who have not challenged or attempted to contest or set aside this trust, my Will or the distribution set forth herein[.]

The court entered its order, dismissing the counterclaim on the basis of its finding that the enforcement of the "no contest" clause would violate public policy. This cross-appeal is taken from that order. The Family Share Beneficiaries contend that the "no contest" clause did not violate public policy and should be strictly enforced to fulfill Mrs. Briggs' unambiguous intentions.

In *Dainton v. Watson*, 658 P.2d 79 (Wyo. 1983), we joined the majority of other states by upholding the validity of a "no contest" clause even though the contest was made in good faith and with probable cause. Mr. Briggs does not question the holding in *Dainton*. He maintains that we must go one step further and join the majority of other states which refuse to uphold a "no contest" clause if the challenged provision is in contravention of the law. Mr. Briggs contends that Mrs. Briggs' trust agreement was invalid because it violated Wyoming's elective share statute and that he should have been able to contest whether he could be cut out of his elective share via use of a trust without fear of reprisal under a "no contest" clause. He reasons that he would not violate a "no contest" clause by claiming his elective share contrary to the terms of Mrs. Briggs' will, so he should be able to likewise challenge the trust agreement.

We are unable to agree with Mr. Briggs that the trust agreement violated Wyoming's elective share statute. The law is quite to the contrary. Wyo.Stat. § 2–5–102 (1980) specifically provides in part:

The right of election of a surviving spouse ... may be waived ... by a written [waiver and, u]nless [the waiver] provides to the contrary a waiver of "all rights" (or equivalent language) in the property or estate of a present or prospective spouse ... is a waiver of all rights to elective share....

The waiver contained in the trust agreement satisfied this statute. *Dainton* is controlling. The unambiguous expressed intent of Mrs. Briggs must govern. The trust agreement clearly stated that anyone who challenged the trust would lose his or her share.

■ It is neither necessary nor proper for this Court to decide in this case whether or not we will enforce a "no contest" clause if a challenged provision in a trust agreement is in violation of the law. Although this question may properly be before us in the future, an opinion rendered in this instance would clearly be advisory. This Court has repeatedly said that it will not issue advisory opinions, and we decline to do so now. *Brad Ragan Tire Company v. Gearhart Industries*, 744 P.2d 1125, 1126 (Wyo.1987); *State Board of Equalization v. Jackson Hole Ski Corporation*, 745 P.2d 58, 59 (Wyo.1987).

Mrs. Briggs' trust agreement was valid, and its provisions were enforceable, including the "no contest" clause.

Affirmed in part, reversed in part, and remanded for entry of a judgment in favor of the Family Share Beneficiaries in accordance with this opinion.

THOMAS, J., files a specially concurring opinion.

URBIGKIT, C.J., files a dissenting opinion.

THOMAS, Justice, concurring specially.

I agree with the decision in this case as reflected in the majority opinion. I am concerned, however, in reaching that determination the court may have, by implication, indicated the statutory right of election afforded to a surviving spouse in a probate proceeding is available with respect to an *inter vivos* trust. In my judgment, that right clearly is not available to a trust beneficiary, and I would so hold.

My concern emanates from that portion of the opinion of the court refuting William R. Briggs' argument that the provisions of the trust agreement are violative of Wyoming's elective share statute. Wyo.Stat. § 2–5–101 (1980). Perhaps the court lends too much credence to that argument, which

does amount to a mixing of apples and oranges. The argument is a *non sequitur* in light of the facts surrounding the validity of the *inter vivos* trust, almost to the point of being specious.

The waiver that is incorporated in the trust agreement constituted a waiver of any interest then held by William R. Briggs in the property transferred into the *inter vivos* trust. That trust agreement was never to be subject to probate; indeed it was created to avoid the probate of the trust assets. The statutory right of election is limited to a right to take against the provisions of a will that has been admitted to probate. The statutory provision relating to waivers is limited to that same right of election. Wyo.Stat. § 2–5–102 (1980). That provision does not validate the waiver by William R. Briggs which is incorporated in the trust agreement except by analogy.

The trust agreement could only violate the elective share statute if it were ruled to be a substitute for a will. In upholding the validity of the trust agreement, I am satisfied that the court did not intend to suggest it is a substitute for a will. Yet, by invoking the waiver statute that specifically pertains to the right to elect to take against the will, the court, by implication, seems to suggest that the trust agreement is equivalent to a testamentary disposition by will. I am satisfied the court would not so hold if that issue were presented directly.

I would limit the effect of the waiver statute specifically applying to the elective share of a surviving spouse to an articulation of legislative policy that is appropriately transferred to the case of an *inter vivos* trust by analogy. *See Wendling v. Cundall*, 568 P.2d 888 (Wyo.1977). The effect is substantially that of invoking by analogy the rule of *Dainton v. Watson*, 658 P.2d 79 (Wyo.1983). It makes sense to have the same rules with respect to the validity of a no contest clause and waiver in the case on an *inter vivos* trust as we have with respect to wills. That appropriately is accomplished by declaring an analogous rule for the case of the *inter vivos* trust. I am satisfied this is the thrust of the majority

opinion, and there is no implication that the *inter vivos* trust is a substitute for a will which is subject to the probate statutes.

URBIGKIT, Chief Justice, dissenting.

## I. INTRODUCTION

This case involves an unsuccessful effort by a disinherited husband to invalidate the trust through which he was substantially disinherited by his wife. By declaratory judgment, appellant William G. Briggs asked the district court to declare his deceased wife's trust invalid and to have the trust assets put into her probate estate, making them subject to his right of election under Wyoming's elective share statute. Under the will, he received various personal property consisting mainly of furniture. The trust contained the lion's share of her assets, nearly $900,000, of which he was only to receive a small percentage—namely a one-seventeenth share of the total. With a finding that the trust was valid, the district court entered summary judgment against the husband, but at the same time declined to enforce a no-contest clause in the trust document.

The majority of this court holds that the district court was correct in declaring the trust valid. The decision is made by approval of summary judgment by reliance on a waiver which is overtly questionable and about which this record contains only allegations and not facts established after a trial. *Stratman v. Admiral Beverage Corp.*, 760 P.2d 974 (Wyo.1988); *Cordova v. Gosar*, 719 P.2d 625 (Wyo.1986). In upholding this revocable trust as a means to thwart the Wyoming elective share statute, this majority goes beyond summary judgment to establish precedent which is contrary to legislative intent and general case law. Therefore, I dissent. The majority also decides that the district court should have enforced the no-contest provision against Mr. Briggs for filing suit which challenged the trust. I conclude that this decision is also incorrect and I would follow the district court in refusal to enforce the provision. Our decision should

have followed that well-considered direction.

## II. WAIVER

Initially, the majority states that it agrees with the contention that Mr. Briggs' written waiver of his right to contest the establishment of the trust and the transfer of property into the trust was valid and enforceable. The majority opinion cites *Ranger Ins. Co. v. Cates*, 501 P.2d 1255 (Wyo.1972) for the proposition that a waiver must be manifested in an unequivocal fashion. I agree that a waiver must be established in an unequivocal fashion; however, I view this proposition as more inclusive and demanding than found in the decisional adaptation for this case.

By quoting *Laird v. Laird*, 597 P.2d 463, 467 (Wyo.1979), the majority recites the Wyoming waiver rule as follows:

> " 'The rule is that the one who signs a paper, without reading it, if he is able to read and understand, is guilty of such negligence in failing to inform himself of its nature that he cannot be relieved from the obligation contained in the paper thus signed, unless there was something more than mere reliance upon the statements of another as to its contents....' *Sanger v. Yellow Cab Co., Inc.*, Mo.1972, 486 S.W.2d 477, 481."

Maj. op. at 265. While I agree that generically speaking this is an appropriate measure of waiver, the facts and circumstances of individual cases can require departure from this test. The departure is required when assumptions mandated by the *Laird* test are not satisfied. *Laird*, 597 P.2d 463. The *Laird* test assumes that a person can understand the document if he reads it. That assumption is not warranted in this case. Like many other non-lawyers and by his own admission, Mr. Briggs did not fully understand the legal documents he signed. It is not clear that even if Mr. Briggs had carefully read what he signed, he would have understood that his signature on that document would have the effect of waiving his elective share as the majority holds it did.

In addition, the *Laird* test requires that there be something more than " 'mere reliance upon the statements of another as to its contents * * *.' " *Id.* at 467 (quoting *Sanger v. Yellow Cab Co., Inc.*, 486 S.W.2d 477, 481 (Mo.1972)). Without analyzing the situation in which this waiver was signed (in the office of Mrs. Briggs' attorney—the same attorney who had previously represented Mr. Briggs), the majority assumes that there was nothing beyond mere reliance upon the statements of another as to the contents of the trust document. The depositions taken during the summary judgment phase demonstrate a very different version of events than the majority's re-characterization. The evidence contained in those depositions certainly presents material questions of disputed facts worthy of more than a dismissal as "unrefuted." Maj. op. at 265. Instead, the disputed facts constitute a sufficient basis to try the case rather than disposing of it on summary judgment. The evidence elicited through those depositions points out several problems with the majority's reliance on Mr. Briggs' waiver as a basis for dismissing his other issues.

The majority states:

*The unrefuted evidence* is that, before Mr. Briggs signed the written waiver, Mrs. Briggs and her attorney recommended to him that he review the contents of the trust agreement with another attorney. Mr. Briggs did not equivocate. He affirmatively stated that he did not want to see another attorney and that he consented to whatever Mrs. Briggs desired to do. Mr. Briggs voluntarily signed the document.

Maj. op. at 265 (emphasis added). It is indeed curious how this decision can refer to "unrefuted evidence" when this case was disposed of by the district court through summary judgment in spite of the conflicting evidence in the record. The only information available to this court beyond the allegations contained in the complaint are two depositions, one from Mr. Briggs and one from his wife's attorney who prepared the trust document. Review of the record and those two depositions, in particular, reflect a very different picture

of the context of Mr. Briggs' waiver than the majority depicts after deeming the evidence "unrefuted."

Initially it appears that even if Mr. Briggs read all he was presented with and assuming he could understand the legal effects and terminology, he still would not have had adequate knowledge that would have allowed him to make a knowing waiver. When presented with the trust document at his deposition, Mr. Briggs stated that he had never seen the trust document before.

Mr. Briggs' deposition also indicates that he was never provided with the entire document prior to signing it:

Q. [Counsel] * * * Let me ask you this: Do you remember in April of 1985 going to [Mrs. Briggs' attorney's] law offices?

A. [Mr. Briggs] Yes, sir, I sure do.

Q. And signing some documents?

A. Yes, sir. I was handed three sheets of paper, two sheets that listed things, a third sheet was for signatures. Eva and I were put in a room by ourselves. I come to the second sheet, and there was a whole list of nieces and nephews and me on the top. And I couldn't figure out what it said or what it meant and I kept asking Eva and Eva said everything is just fine, I'm leaving everything to you. And I got witnesses right down the road here over in Crowheart that told me the same thing. I stopped on the way into town so I saw them. And they said, well, that's their understanding, too, was that Eva said she was leaving everything to me. But anyhow I signed the darn thing, and still I didn't know what it meant, what it said cause there wasn't but three sheets of paper there, and I think [the attorney who prepared the trust] will agree to that.

In reference to there only being three sheets out of a total of thirteen which constituted the entire trust document, the following questions and answers occurred:

Q. [Counsel] Okay. Did someone deliver the papers to you?

A. [Mr. Briggs] [The attorney] handed us the three sheets that we had.

* * * * * *

Q. When [the attorney] handed you the papers did he say anything to you?

A. Said the rest of the sheets were being typed.

If Mr. Briggs is correct in his assertion that he only received three pages of the trust document when he signed it, then he did not receive and could not have read the entire waiver clause. Instead, he would only have seen this portion of the clause: "all right he may have to contest the establishment of the trust or the transfer of any property of his wife as Settlor to the trust." The portion of the waiver clause which Mr. Briggs would not have seen stated: "William G. 'Bud' Briggs, for and in consideration of the gift set forth herein to him and for and in consideration of the natural love and affection for his wife, Eva Topping Briggs, Settlor herein, hereby joins in the establishment of this trust for the purpose of waiving any and[.]'"

Naturally, the attorney who prepared the trust document presented a different version of events in his deposition. He claimed that Mr. Briggs had received all of the pages of the trust document.

Q. [Counsel] * * * Let me ask you to look at the trust now, which we've identified as Deposition Exhibit 1 Briggs. Now, at the time Mr. and Mrs. Briggs came into your office did you give them a complete copy of that trust?

A. [Attorney Who Prepared the Trust] To the best of my knowledge, yes; this was a second or third draft. So I'm not aware of any reason for there to be any pages missing.

This contrasting testimony casts doubt on the validity of Mr. Briggs' waiver and on the majority's readiness to accept it as valid. In any event, it certainly demonstrates that there were sufficient disputed questions of material fact to make summary judgment improper in this case.

The other factor which places considerable doubt upon the validity of Mr. Briggs' waiver is the role of the attorney who prepared the trust. Under *Laird,* a person

who signs a document without reading it is guilty of such negligence that he cannot be relieved of the obligation " 'unless there was something more than mere reliance upon the statements of another as to its contents * * *.' " *Laird*, 597 P.2d at 467 (quoting *Sanger*, 486 S.W.2d at 481). Given the context of Mr. Briggs' meeting with his wife's attorney, there was something more than mere reliance upon the statements of another concerning the trust document contents. The case requires an issue of fact examination. *Jarvis v. Jarvis*, 16 Kan.App.2d 249, 824 P.2d 213 (1991). This is described as the "demonstrated" willingness to act unintelligently. *Id.*, 824 P.2d at 217.

It is important to recognize the previous history between this particular attorney and Mr. Briggs. Approximately five or six years prior to the time frame involved in this litigation, this attorney had represented Mr. Briggs. In his deposition, the attorney explained that he had represented Mr. Briggs when Mr. Briggs had had a problem with an investment he had made. Clearly, a previous attorney-client relationship existed because when asked about the specifics of the prior representation on the investment problem, the attorney invoked the attorney-client privilege:

> Q. At the time this will was prepared you had previously represented Mr. Briggs in a, where he had invested money in an unprofitable investment; is that correct?
>
> A. That's correct. He was basically defrauded.
>
> Q. Just real briefly what were the details?
>
> A. Well, I guess I can talk about what's public record * * * and I'll be happy to tell you whatever you want if Bud [Mr. Briggs] wants to sign something waiving the privilege, but I suspect a privilege still attaches to that.

Since this attorney had represented Mr. Briggs in another matter, it is reasonable that Mr. Briggs might have believed that what he was being told by this attorney, who he could have perceived as representing him, was consistent with his best interest. There would be no reason for Mr. Briggs to suspect that this attorney was acting in something other than his best interests which he perceived as being aligned with his wife's interests at that time.

Although things were perhaps confusing to Mr. Briggs, the attorney did not find the situation confusing at all. When questioned about who he was representing, this attorney offered the following testimony:

> Q. [Counsel] When you made up the will and trust you told me earlier that you were representing Eva Briggs; is that correct?
>
> A. [Attorney Who Prepared the Trust] That's correct.
>
> Q. And you were looking out for her best interest; is that correct?
>
> A. That's correct.
>
> Q. And you were not representing Mr. Briggs; is that correct?
>
> A. No, I wasn't.
>
> Q. And you didn't, you weren't necessarily looking out for his best interest; is that correct?
>
> A. No, I wasn't.

This previous representation presents the very real risk of a conflict of interest. At the very least, it presents the problem of joint representation of spouses when their interests may conflict. For discussion of ethical concerns relating to joint representation in estate planning, see Mercer D. Tate, *Handling Conflicts of Interest That May Occur in an Estate Planning Practice*, 16 Estate Planning 32 (1989) and Thomas L. Shaffer, *The Family as a Client—Conflict or Community?*, 34 Res Gestae 62 (1990).[1]

---

**1.** We cannot so casually escape the serious ethical questions which may be in fact not so casually presented:

1. Prior representation of the husband;
2. Spouse called into the office of his prior attorney who now represents his wife;

3. Complex documents involving serious adverse results with whatever explanation is provided by the other person's attorney in whom the spouse relied for legal advice;

Although this attorney was not confused about his role, another aspect of his representation of Mrs. Briggs' estate could have eventually become a source of confusion to Mr. Briggs. The deposition of the attorney contains the following:

Q. [Counsel] * * * [O]ur Wyoming statute 2–5–102 provides for a waiver of right of election in homestead allowance. And that section states that the right of election of a surviving spouse and the rights of the surviving spouse to homestead allowance, exempt property and family allowance for any of them may be waived totally or partially before or after marriage by written contract, agreement or waiver signed by the party waiving after fair disclosure. Do you feel that Mr. Briggs was given fair disclosure before he signed these trust documents?

A. [Attorney Who Prepared the Trust] I don't concede that that statute is applicable to the establishment of a trust. You're talking about rights in probate with respect to the probate of a will or in intestate with respect to intestacy, the administration of an estate where there is no will.

Q. So you're the attorney for the estate of Eva G. Briggs, are you not?

A. Yes, I am.

Q. And that the personal representative in that estate provided Mr. Briggs with a notice of a right to elect, did you not?

A. Yes.

Q. And did you prepare that advice?

A. Yes, I did.

The attorney claims that he told Mr. Briggs to seek independent legal advice concerning the trust. On the other hand, Mr. Briggs did not recall being told to seek independent legal advice. This constitutes another disputed material fact, making summary judgment improper as well as raising considerable inference that there was something other than mere reliance upon the statements of another about the trust contents.

One commentator has suggested that the spouse, who may view the lawyer as representing him or her as well as the spouse who sought the estate planning advice, is entitled to be informed of his or her elective share rights during the estate planning process. This commentator discusses joint representation in the context of representing a client who owns a business and also seeks estate planning advice from a lawyer:

> Under many state statutes the surviving spouse may renounce limited beneficial interests in trust and elect to take a portion of the estate outright. Under either the Disciplinary Rules or the Model Rules the lawyer could certainly not represent the surviving spouse after death without informing him or her of the various spousal rights. Must these also be disclosed in the process of estate planning? If, under the circumstances, the spouse is "dependent" upon you as lawyer and would not be reasonably expected to seek any other advice, it is arguable that the "full disclosure" or "consultation" would cover such an area.

James R. Wade, *When Can A Lawyer Represent Both Husband and Wife in Estate Planning?*, 1–2 Probate and Property 13, 14–15 (1987).

Because of the attorney's former representation of Mr. Briggs, several ethical

---

4. Perhaps within the conflict of evidence, only handed part of the entire document to read;

5. Instructed to sign then and there without direction to take the document home and carefully read it and consider it at his leisure;

6. Never advised in any regard that in addition to a trust, there was a waiver in the document of a statutory right created by law for the protection of a person such as this individual with the waiver provision lasting beyond the death of his wife; and

7. Beyond everything else, the attorney should never have permitted the document to have been signed then and there with the appearance of reliance that certainly was likely to be created. The individual should never have been permitted to sign such a document in the attorney's office when, for the unrepresented person, execution of the document was contrary to the unrepresented party's best interest. This is identical with divorce case joint representation which has a causality to create havoc and should be eliminated from every careful practitioner's legal practice.

considerations are relevant. *See, e.g.,* Wyoming Rules of Professional Conduct for Attorneys at Law, Rule 1.7 (general conflict of interest), Rule 1.9 (conflict of interest in the former client context) and Rule 4.3 (dealing with unrepresented persons). If the situation is as the attorney contends and the attorney was not representing Mr. Briggs, because of the former representation and the inherent possibility of confusion, Rule 4.3 would require that the attorney "make reasonable efforts to correct the misunderstanding" if the attorney knows or should know the unrepresented person misapprehends the attorney's role.

At the very least, the attorney's representation of Mr. Briggs on another matter raises a concern relative to Rule 1.9 and Mr. Briggs' status as a former client. The concerns underlying Rule 1.9 are "the potential for violation of the lawyer's duty of loyalty, as well as the risk that confidential information gained in a prior representation will be used to the disadvantage of the former client." ABA/BNA *Lawyers' Manual on Professional Conduct* § 51:202 (1987). Although it may not be a substantially related matter, there was relevant information (which may or may not have been confidential) from the bad investment deal that could have been used in this estate planning situation. Mrs. Briggs wanted to disinherit Mr. Briggs in part because she did not see him as being a good money-manager. The investment deal that the attorney represented him on was the basis for her conclusion. Because it can be a close call whether a matter is substantially related, the following advice is given: "If the case is reasonably close, the lawyer usually serves everyone's interests—including her own—by initially assuming that the rule *does* apply and then seeking the former client's consent." Geoffrey C. Hazard, Jr. & W. William Hodes, 1 *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct,* § 1.9:202 (2d ed.1985) (emphasis in original).

Since this case is before us only in a summary judgment posture, it would be premature to make a determination as to what the exact situation was and, thus, which Rules of Conduct apply if they apply

at all. However, the depositions indicate that these are potential concerns which cast a shadow of doubt upon the validity and reliability of Mr. Briggs' waiver upon which the majority relies so heavily. These potential ethical problems demonstrate that at the very least, Mr. Briggs could have been confused about the attorney's role. Consequently, the majority's heavy reliance on Mr. Briggs' waiver is questionable under either the standard applied by the majority or any other applicable standard.

Additionally, the majority's application of a generic waiver rule is misguided given the legislature has provided a specific waiver provision when an elective share is involved. The waiver, which is required for waiving an elective share, is as follows:

The right of election of a surviving spouse and the rights of the surviving spouse to homestead allowance, exempt property and family allowance, or any of them, may be waived totally or partially before or after marriage, by a written contract, agreement or waiver signed by the party waiving, *after fair disclosure.*

Wyo.Stat. § 2–5–102 (1980) (emphasis added). "Fair disclosure" is the standard the statute requires. Fair disclosure did not occur here. For further discussion of fair disclosure in the marital context, see William M. McGovern, Jr., Sheldon F. Kurtz & Jan E. Rein, *Wills, Trusts and Estates: Including Taxation and Future Interests,* § 3.9 (1988).

The ancestral history of the Wyoming statutes on Rights of Surviving Spouse, Wyo.Stat. § 2–5–101 through § 2–5–105 (1980), cannot be ignored. The closely confining requirement including judicial advice found in Wyo.Stat. § 2–5–104 had its derivation from the case of *Hartt v. Brimmer,* 74 Wyo. 356, 287 P.2d 645 (1955) and the associated case of *Hartt v. Brimmer,* 74 Wyo. 338, 287 P.2d 638 (1955). In *Hartt,* the widow had not been given realistic advice about her right to make the spouse's election by the attorney and banker who represented the estate and acted with a realistic conflict of interest in the proceeding. In *Hartt,* 287 P.2d 645, this court accepted a questionable waiver which was

followed in the next term of the Wyoming State Legislature when its membership reacted in righteous anger by enactment of an effective correction to eliminate any unknowledgeable imposition of a waiver on the surviving spouse. Principally sponsored by state Senator Elmer Kinnaman, elected from the county where the disinherited widow lived, the legislature in 1957 enacted Original Senate File 42, which completely changed processing required for advice and determination by the surviving spouse of their right of election in probate disinherited cases. 1957 Wyo.Sess. Laws ch. 204, § 1. The legislature, lacking faith in the sufficiency of advice that attorneys might give and the potentialities of another case of conflict of interest, required that the advice to the spouse be given by the *probate judge. Id.* That provision remains in Wyoming law today because of practitioner and legislative recollection of the problems encountered by the substantially disinherited widow in *Hartt. See* Wyo.Stat. § 2–5–104. The anti over-reaching preclusions of Wyo.Stat. § 2–5–104 were not ignored in the Wyo.Stat. § 2–5–102 fair disclosure criteria of an advance waiver.

In this decision, we ignore the probate code history of *Hartt.* Furthermore, we regress to make the same unnecessary mistake, which was legislatively reversed in 1957 for other cases which would follow (until now in 1992).

## III. VALIDITY OF THE TRUST

The majority concludes that the trust is valid without fully examining the question of validity. The majority opinion states: "Mrs. Briggs' trust agreement was valid, and its provisions were enforceable, including the 'no contest' clause." Maj. op. at 266. This assumption by the majority is not supported by the trust instrument. The very elements that are necessary to differentiate a trust from a will are not present in this trust set-up. This is a crucial point because if the trust is not valid and is indeed testamentary in nature, then not only is there a question about its validity but also the elective share statute would

clearly be applicable. The Wyoming elective share statute states that it is applicable to testamentary or "will" dispositions of property.

Mrs. Briggs retained a great deal of control over her property which makes the creation of this inter vivos revocable trust questionable. Mrs. Briggs was not only the settlor of the trust but she was also the trustee. In addition, she had the right to receive the net income and withdraw principal from the trust. All that Mrs. Briggs would have had to do in order to remove property from the trust would have been to deliver to herself as trustee a written instrument which transferred the property out of the trust. Mrs. Briggs also had broad settlor powers to amend and even revoke the entire trust.

In addition to the broad settlor powers Mrs. Briggs retained for herself, she also had broad powers in her capacity as trustee. The trust instrument provided that Mrs. Briggs as trustee could mortgage, create a security interest in or pledge any property in the trust. Under the terms of the trust, the trustee also had the power to sell or convey any or all trust property and reinvestment from trust property at any time and as the trustee saw fit. Since Mrs. Briggs was the settlor and the trustee and she had such broad powers acting under both capacities, it is questionable whether she did indeed make a valid gift of her property to the trust during her life. It is at least questionable enough to preclude the entry of summary judgment.

When the settlor retains such broad control over an inter vivos revocable trust there is an argument that the trust is not valid because the settlor has not truly parted with the trust corpus. Restatement (Second) of Trusts § 26 (1959) states that "[a] manifestation of intention to create a trust inter vivos at some time subsequent to the time of the manifestation does not create a trust." Restatement (Second) of Trusts, *supra,* at § 26 cmt. a states: "The rule stated in this Section is applicable whether the settlor manifests an intention to create a trust by transferring property to another person as trustee or by declar-

ing himself trustee. In both cases there is a question whether a trust immediately arises, and, if not, whether a trust subsequently arises." The comment goes on to further explain that the presence of certain factors do not by themselves manifest an intent, but rather each situation must be examined in order to determine the settlor's intent. Therefore, the Restatement makes plain that the settlor's intent is at least a relevant issue, and thus not appropriate for summary disposition. The appendix to the Restatement of section 26 describes a case in which

> the court found that where the effect of an inter vivos trust was to remove assets from the decedent's estate, which would otherwise have been available for the surviving spouse's distributive share, and the decedent had reserved the practical attributes of ownership in himself for life, then the trust property may be subject to claims made by the surviving spouse under the laws regulating succession to decedents' estates.

Restatement (Second) of Trusts § 26 at 147 appendix (1987) (citing *Staples v. King*, 433 A.2d 407, 410 (Me.1981)). Thus, while a question concerning the validity of a trust may arise just by virtue of the fact that a settlor is also trustee and has reserved several key powers, this question deserves special scrutiny when a trust may have been created to deprive a surviving spouse of his or her elective share.

The effect of an inter vivos revocable trust upon a spouse's elective share is an issue which has produced varying court decisions [2] and also presents two important competing policy considerations. On the one hand, persons should be free to dispose of property during their life as they desire. However, many states, including Wyoming, have chosen to place a limitation on that nearly absolute right in the form of its elective share statute. Wyo.Stat. § 2–5–101. The policy reason behind elective

share statutes, in part, is to provide for spouses and limit potential economic hardship. Betty Jean Garrett Pherigo, Note, *Estate Planning: Validity of Inter Vivos Transfers Which Reduce or Defeat the Surviving Spouse's Statutory Share in Decedent's Estate*, 32 Okla.L.Rev. 837, 838 (1979). Balancing these competing policy concerns is difficult and has generated several divergent approaches in courts which have considered the issue.

> [T]he laws of the states vary with respect to the right of the survivor to assets transferred to a revocable trust before the decedent's death. In some states, by statute, the survivor can reach trust assets (e.g. New York, Pennsylvania), but in others his or her rights extend only to probate assets (e.g. Connecticut, Illinois). See *1 Scott, Trusts* § 57.5. In addition, some states permit the survivor to reach the trust assets only if the transfer was made with the intent of defeating the survivor's rights (e.g. Missouri), or was illusory because the settlor retained substantial control over the trustee or trust assets (e.g. Illinois). See *Newman v. Dore*, 275 N.Y. 571 [371], 9 N.E.2d 966 (1937). Some states (e.g. Florida) permit the survivor to reach trust assets only if he or she was not adequately provided for by other means (e.g. insurance). It should be noted that the legislative trend is to permit trust assets to be reached whenever the settlor has retained the power to revoke. (See *NY Est Powers & Trusts Act § 5.–1.1(b) 1(E); Pa.Stat.Ann. tit. 20 § 301.11 (Supp.1967); Uniform Prob Code § 2–202*).

John R. Cohan & Geraldine S. Hemmerling, *Inter Vivos Trusts: Planning, Drafting, and Taxation*, § 2.25 (1975 & Supp.1983). *See also* E. William Carr, *Revocable Trusts*, § 201.4 (1980) and Jeffrey A. Schoenblum, 1 *Multistate and Multina-*

---

**2.** *See* J.R. Kemper, Annotation, *Validity of Inter Vivos Trust Established by One Spouse Which Impairs the Other Spouse's Distributive Share or Other Statutory Rights in Property*, 39 A.L.R.3d 14 (1971 & Supp.1991). For related issues, see Wanda Ellen Wakefield, Annotation, *What Constitutes Transfer Outside the Will Precluding Sur-*

*viving Spouse from Electing Statutory Share Under Uniform Probate Code*, 11 A.L.R.4th 1213 (1982); and John H. Derrick, Annotation, *Construction, Application, and Effect of Statutes Which Deny or Qualify Surviving Spouse's Right to Elect Against Deceased Spouse's Will*, 48 A.L.R.4th 972 (1986).

*tional Estate Planning*, § 10.01 at 265 (1982).

Since legally as well as factually there is an unresolved question as to whether there was a valid waiver, the trust itself must be examined to determine whether it is valid and whether it violates Wyoming law. The majority chooses to avoid this important question. Further, the policy rationale underlying Wyoming's elective share statute demonstrates that this issue is certainly not an appropriate one for summary judgment dismissal. The viability of an inter vivos revocable trust as a vehicle to avoid application of Wyoming's elective share statute is a question of first impression for this state and presents a novel legal question that should not be summarily dismissed as a matter of law.

## IV. WYOMING'S ELECTIVE SHARE STATUTE

The current version of Wyoming's elective share statute entitles spouses to an elective share in the following fashion:

(a) If a married person domiciled in this state shall by will deprive the surviving spouse of more than the elective share, as hereafter set forth, of the property which is subject to disposition under the will, reduced by funeral and administration expenses, homestead allowance, family allowances and exemption, and enforceable claims, the surviving spouse has a right of election to take an elective share of that property as follows:

(i) One-half (½) if there are no surviving issue of the decedent, or if the surviving spouse is also a parent of any of the surviving issue of the decedent; or

(ii) One-fourth (¼), if the surviving spouse is not the parent of any surviving issue of the decedent.

Wyo.Stat. § 2–5–101.

Although other states have adopted legislative remedies for spouses whose elective share is thwarted by their deceased spouse,[3] Wyoming has not yet done so. In 1980, when the Wyoming Probate Code was revamped, the legislature did adopt certain provisions of the Uniform Probate Code.[4] However, the "augmented estate" concept which is utilized under the Uniform Probate Code was not adopted.[5] Under the "augmented estate" concept, the decedent's estate is augmented by calculating the contents of the estate by including things such as transfers of property during marriage without adequate consideration. 8 Uniform Laws Annotated, Uniform Probate Code § 2–202 at 75–76 (1983 & Supp. 1991) (now covers property transferred within two years of death). The augmented estate concept is used to prevent the decedent or testator from deliberately defeating the surviving spouse's elective share by discouraging disposal of property through means other than probate and to prevent the surviving spouse from exercising his or her right of election when the spouse has been adequately provided for with non-probate arrangements such as life insurance or joint tenancy assets.[6] By not adopting the "augmented estate" concept, the Wyoming legislature has not provided a precise statutory scheme for balancing the equities between allowing a person to freely make gifts of his or her property during life and the policy of protecting spouses from disinheritance. Thus, without specific legislative direction, the judiciary is left to the difficult task of balancing the equities.

Various courts around the country have approached this task with a wide array of

---

**3.** Missouri and Pennsylvania have legislatively adopted protection for the surviving spouse while other states protect surviving spouses judicially. *See* E. William Carr, *supra*, at 56–57.

**4.** *See Douglas v. Newell*, 719 P.2d 971, 974–75 n. 2 (Wyo.1986) and Lawrence H. Averill, Jr., *The Wyoming Probate Code of 1980: An Analysis and Critique*, XVI Land & Water L.Rev. 103, 108 (1981).

**5.** Averill, *supra* n. 4, XVI Land & Water L.Rev. at 120; *see also* Appendix I, *Source and Status of The Wyoming Probate Code of 1980*, XVI Land & Water L.Rev. 389, 391 (1981).

**6.** Richard V. Wellman, 1 *Uniform Probate Code Practice Manual* 84 (2d ed. 1977).

decision calculuses. One commentator has categorized the various approaches and determined that the majority of courts follow a "retention of control" test and that a minority follow an "intent to defraud" test. Pherigo, *supra*, 32 Okla.L.Rev. at 851, Appendix A. Categorizing these tests is difficult since the rationales used by various courts often overlap. In my view, the trust created by Mrs. Briggs would fail regardless of which test is applied. Mrs. Briggs had the express intent to ensure that Mr. Briggs would not take any of her significant assets through the elective share when she discussed, planned and created the trust.

The trust that Mrs. Briggs created would fail under the "retention of control" approach. The "retention of control" test was recently stated as follows:

> [A] trust was invalid where the settlor retained powers over the trust assets so extensive that he had until his death the same rights in the assets of the trust after creating it that he had before its creation. *See e.g., Moore v. Jones*, 44 N.C.App. 578, 261 S.E.2d 289 (1980); *Newman v. Dore*, 275 N.Y. 371, 9 N.E.2d 966 (1937).

*Seifert v. Southern Nat. Bank of South Carolina*, 409 S.E.2d 337, 338 (S.C.1991). Several other jurisdictions have applied a similar "retention of control" test to invalidate inter vivos trusts which deprive surviving spouses of their elective share. *See, e.g., In re Estate of Puetz*, 167 Ill.App.3d 807, 118 Ill.Dec. 584, 587, 521 N.E.2d 1277, 1280 (1988) (summary judgment reversed); *Newman By and Through Ausemus v. George*, 243 Kan. 183, 755 P.2d 18, 22 (1988); *Staples*, 433 A.2d at 411; *Knell v. Price*, 318 Md. 501, 569 A.2d 636, 642 (1990); *Methodist Episcopal Church v. Hadfield*, 53 Md.App. 205, 453 A.2d 145, 148 (1982) (remand for further hearing without affirmance or reversal); and *Johnson v. Farmers & Merchants Bank*, 180 W.Va. 702, 379 S.E.2d 752, 761 (1989) (bal-

ancing the equities as well as retention of control). In other cases, application of the "retention of control" test has resulted in courts upholding trusts against the statutory right of election of a surviving spouse. *See Matter of Chandler's Estate*, 90 Ill. App.3d 674, 46 Ill.Dec. 46, 51, 413 N.E.2d 486, 491 (1980); *Matter of Nemecek's Estate*, 85 Ill.App.3d 881, 41 Ill.Dec. 157, 159, 407 N.E.2d 655, 657 (1980); *Payne v. River Forest State Bank & Trust Co.*, 81 Ill. App.3d 1128, 37 Ill.Dec. 136, 140, 401 N.E.2d 1229, 1233 (1980); *Johnson v. La Grange State Bank*, 73 Ill.2d 342, 22 Ill. Dec. 709, 719, 383 N.E.2d 185, 195 (1978); and *Leazenby v. Clinton County Bank & Trust Co.*, 171 Ind.App. 243, 355 N.E.2d 861, 865 (1976). Likewise, the right of revocation makes the transfer " 'fallacious, illusive and deceiving * * *.' " *Jarvis*, 824 P.2d at 218 (quoting *Ackers v. First Nat. Bank of Topeka*, 192 Kan. 319, 333, 387 P.2d 840 (1963), *opinion clarified* 192 Kan. 471, 389 P.2d 1 (1964)).

Application of the "retention of control" test would invalidate the trust that Mrs. Briggs created by virtue of the degree of control she had over the property even after it was conveyed to the trust. The fact that Mrs. Briggs was both the settlor and trustee ensured that she would easily be able to transfer property in and out of the trust as she desired. She did not alienate the benefit of the property she placed in the trust because she retained the right to receive the income from the trust property during her lifetime. The fact that she could revoke the entire trust at anytime she so desired also indicates that she retained such control over the trust property so that there was no valid donative intent when she conveyed the property into the trust.

The other approach, albeit somewhat overlapping, is the "fraud on marital rights" approach which has been utilized by a number of courts and even codified in one state.[7] The test is applied as follows:

---

7. The common law fraud on marital rights doctrine has been codified in Missouri as follows:
"Any gift made by a person ... in fraud of the marital rights of his surviving spouse to

share in his estate, shall, at the election of the surviving spouse, be treated as a testamentary disposition and may be recovered from the donee and persons taking from him without

To determine if fraud of marital rights occurred, the court examines the intent of the transferring spouse. [*Estate of Bernskoetter*, 693 S.W.2d 249, 252 (Mo. App.1985) ]; *Matter of Estate of La-Garce*, 532 S.W.2d 511, 515 (Mo.App. 1975). The burden of proving the decedent's fraudulent intent in transferring personal property is on the surviving spouse. *Id.* In determining the decedent's intent, the court may consider and weigh all the facts and circumstances in the case.

*Matter of Estate of Froman*, 803 S.W.2d 176, 179 (Mo.App.1991). Several other jurisdictions have utilized this approach and found inter vivos transfers invalid. *See, e.g., Stoxen v. Stoxen*, 6 Ill.App.3d 445, 285 N.E.2d 198, 199 (1972) (remanded for further hearing); *McCarty v. State Bank of Fredonia*, 14 Kan.App.2d 552, 795 P.2d 940, 947 (1990) (individual retirement account); and *Riggio v. Southwest Bank of St. Louis*, 815 S.W.2d 51, 53 (Mo.App.1991). The fraud on marital rights approach has also been used to find trusts valid in particular circumstances. *See, e.g., Richards v. Worthen Bank & Trust Co.*, 261 Ark. 890, 552 S.W.2d 228, 230 (1977); *McDonald v. McDonald*, 814 S.W.2d 939, 945–46, 951 (Mo.App.1991); and *Hanke v. Hanke*, 123 N.H. 175, 459 A.2d 246, 249 (1983). Other courts that have used a general "balancing of the equities" approach have found trusts not subject to election in particular circumstances. *See Windsor v. Leonard*, 475 F.2d 932, 934 (D.C.Cir.1973) and *Davis v. KB & T Co.*, 172 W.Va. 546, 309 S.E.2d 45, 50 (1983).

The record in this case demonstrates that Mrs. Briggs had the express and explicit intent of avoiding the elective share statute by creating a revocable trust. When her attorney was questioned about her intention in creating the trust, he gave these answers:

Q. [Counsel] [J]ust so I'm not confused about your discussion with Eva, did you and she discuss the fact that Bud

adequate consideration and applied to the payment of the spouse's share...."

would be, may have a claim on one half of her assets?

A. [Attorney Who Prepared the Trust] Early on we talked about Wyoming statutes with regard to how much you can leave by will to someone other than a surviving spouse.

Q. And was Eva concerned about that?

A. She was concerned about it, yes.

Q. And if I understand your testimony correctly her concern was she did not want Bud to have the half that the Wyoming statutes would provide if there were no transfer of the ownership of her assets?

A. Yes.

Q. So one of your objectives in drafting the will and the trust pursuant to Mrs. Briggs' instruction was to draft them in such a way that Mr. Briggs would not receive half; is that correct?

A. Half of all of Mrs. Briggs' property; that's correct.

\*　　\*　　\*　　\*　　\*　　\*

Q. But she was concerned about the fact that he could elect against one half of her probate estate; was she not?

A. If she left it in her name and if all she had was a will, yes.

Q. And she didn't want that, did she?

A. No, she didn't.

It is obvious from the record that Mrs. Briggs had the express intent to deprive her spouse of his marital rights under Wyoming's elective share statute. Surviving spouses can set aside transfers made in violation of marital rights when " 'the voluntary conveyance which the widow may set aside as fraudulent is one executed with the *intent and purpose* to defeat his wife's marital rights.' " *McDonald*, 814 S.W.2d at 945 (quoting *Potter v. Winter*, 280 S.W.2d 27, 35–36 (Mo.1955) and emphasis in original).

Even cases that have found inter vivos trusts valid to defeat the spouse's elective share would likely find this trust invalid

*Matter of Estate of Froman*, 803 S.W.2d 176, 179 (Mo.App.1991) (quoting § 474.150 of the Missouri Statutes).

because of the degree of control Mrs. Briggs had over the trust assets. *See Davis,* 309 S.E.2d 45 and *Leazenby,* 355 N.E.2d 861.

## V. NO–CONTEST PROVISION

I must also disagree with the majority's decision to reverse the district court and apply the no-contest clause to Mr. Briggs' disadvantage. The no-contest clause that Mrs. Briggs included in the trust provides, in essence, that if any named beneficiaries contest the establishment of the trust or take legal action to set aside or challenge the trust, then the gift to him or her shall fail and be distributed to the remaining beneficiaries who did not challenge the trust. The district court judge wisely did not apply the no-contest clause in this situation since a legitimate question about the legality of the trust exists.

In reversing to apply the no-contest clause, the majority relies on *Dainton v. Watson,* 658 P.2d 79 (Wyo.1983). The majority's reliance on *Dainton* is misplaced. *Dainton* involved a sister who unsuccessfully challenged her brother's will on the grounds of improper execution, incompetency and undue influence. *Id.* at 80. The present situation is very different indeed. The challenge Mr. Briggs advances is based on the legality of the trust itself in the face of a contrary legislative mandate, the elective share statute. In *Dainton,* the court was concerned with effectuating the intent of testators. The same rationale is not applicable here since the basis for the challenge is a statute. Perhaps the majority would not rest quite so easily on the overriding powers of a testator's intent in the face of a contrary statute if the statute at issue were an estate tax statute. Would the majority then say that testator's intent easily overrides any legislative pronouncement?

I think the rationale quoted by Justice Rose in his specially concurring opinion is more applicable. *Dainton,* 658 P.2d at 82–83. Justice Rose quoted from the argument advanced by the Iowa Supreme Court in *In re Estate of Cocklin,* 236 Iowa 98, 17 N.W.2d 129, 132–33 (1945). Before a court admits a will to probate, it has a duty to determine the facts and circumstances that bear on its validity. *Dainton,* 658 P.2d at 83. The court must learn of the true facts in order to obtain just results and there should not be roadblocks to obtaining that information. *Id.* Therefore, the argument goes, a will contest made in good faith and upon probable cause should not be penalized. *Id.* If we were to strictly construe all no-contest provisions as the majority does here, trust provisions that flew in the face of valid legislative enactments would never be raised before this or any other court for fear that the challenger would lose any gift they are provided by a will or trust.

As the previous discussion indicates, the validity of an inter vivos trust—especially one that appears to be testamentary in nature and in direct conflict with an elective share statute—is not a settled area of the law. Mr. Briggs had a good faith and valid argument that the trust violated the elective share statute. He should not be penalized for seeking an answer to this legal question. I would hold that the district court correctly decided not to apply the no-contest provision and affirm in that respect. Within any realistic examination, Mr. Briggs had a reasonable statutory argument. In addition, I think he was substantively right at least to the stage of a validating trial opportunity and should not have suffered inheritance denial by summary judgment.

I respectfully dissent from the entire majority opinion.